# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-0958


# LAURA COX, ET UX.

# VERSUS

# SHELTER INSURANCE COMPANY, ET AL.


************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20066398
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

************

## JIMMIE C. PETERS
## JUDGE

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, and Jimmie C. Peters and J. David Painter, Judges.


**AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART, AND RENDERED.**


**Lee A. Archer**
**Law Office of Lee A. Archer**
**1225 Rustic Lane**
**Lake Charles, LA 70605**
**(337) 474-4712**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
   **Laura Cox Brown**
   **C. Linzay Brown**

**Frank Tomeny, III**
**Tomeny & Fisher**
**6709 Perkins Road**
**Baton Rouge, LA 70808**
**(225) 767-8333**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
 **Laura Cox Brown**
 **C. Linzay Brown**

**Jason L. Melancon**
**Melancon, Rimes**
**8706 Jefferson Highway, Suite B**
**Baton Rouge, LA 70809**
**(225) 303-0455**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
 **Laura Cox Brown**
 **C. Linzay Brown**

**Thomas R. Hightower, Jr.**
**Patrick Wade Kee**
**Michael S. Harper**
**A Professional Law Corporation**
**1019 Lafayette Street**
**Post Office Drawer 51288**
**Lafayette, LA 70505**
**(337) 233-0555**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
 **Shelter Mutual Insurance Company**
 **Caroline E. Lambert**

PETERS, J.

The plaintiffs in this personal injury action, Laura Cox Brown and her husband, C. Linzay Brown, brought suit against Caroline E. Lambert and her liability insurer, Shelter Insurance Company, to recover damages they sustained in a multi-vehicle accident that occurred in Lafayette Parish on January 2, 2006. After a jury trial in April of 2008, the final judgment set Mrs. Brown's general damages at $25,000.00 and the couple's past and future medical expenses at $86,000.00 but reduced the awards by fifty percent. The Browns now appeal the judgment, asserting four assignments of error. For the following reasons, we reverse the trial court judgment in part and render judgment in favor of the Browns, finding no fault on the part of Mrs. Brown in causing the accident, increasing the quantum award, and taxing all court costs to the defendants.

## DISCUSSION OF THE RECORD

The accident in dispute occurred on Kaliste Saloom Road in Lafayette Parish and involved four vehicles driving in the same direction. Franklin D. Robinson operated the lead vehicle, Peggy LeBlanc operated the next, Mrs. Brown operated the next, and Ms. Lambert operated the last. The accident began to develop when Mr. Robinson stopped his vehicle to avoid an unrelated accident that had taken place in front of him as he approached a red light. Ms. LeBlanc timely responded by coming to a full stop behind Mr. Robinson. As Mrs. Brown attempted to stop, her vehicle was struck from the rear by Ms. Lambert's. While there exists a question concerning whether Mrs. Brown's vehicle struck Ms. LeBlanc's before being struck by the Lambert vehicle, it is unquestioned that Ms. Lambert's vehicle did strike Mrs. Brown's, driving it into the rear of Ms. LeBlanc's vehicle, which was in turn driven into the rear of Mr. Robinson's vehicle.

With regard to the impact sequence, Mrs. Brown testified that she had come to a complete stop before being struck by the Lambert vehicle and that her first impact with Ms. LeBlanc occurred when her vehicle was driven into the rear of Ms. LeBlanc's vehicle by the impact from the Lambert vehicle. Her version of the accident was supported by the testimony of Officer James Soileau of the Lafayette Police Department, who was the investigating officer at the scene of the accident. Officer Soileau testified that both Ms. LeBlanc and Mrs. Brown told him that Mrs. Brown had come to a complete stop and that Mrs. Brown's vehicle impacted Ms. LeBlanc's only after Ms. Lambert's impact with Mrs. Brown's vehicle.

Ms. LeBlanc disputed the single impact scenario. She gave Officer Soileau a written statement shortly after the accident in which she asserted that Mrs. Brown's vehicle struck hers before Ms. Lambert impacted Mrs. Brown's vehicle, and that after that impact, she was struck again by Mrs. Brown's vehicle. She repeated the two-impact assertion in her trial testimony.

Ms. Lambert's testimony was conflicting on this point. She first testified that she observed Mrs. Brown's vehicle impact with Ms. LeBlanc's before she struck Mrs. Brown. However, despite making this assertion, she admitted that she could not see in front of Mrs. Brown's vehicle. In describing how she struck Mrs. Brown, Ms. Lambert testified that there was nothing that prevented her from seeing Mrs. Brown's vehicle. She explained that she first slowed down because she was approaching a red light; that she saw Mrs. Brown's brake lights go on as Mrs. Brown also slowed for the red light; that the light turned green, Mrs. Brown's brake lights went off, and both she and Mrs. Brown began to accelerate; that she then saw Mrs. Brown's brake lights go on again; and that two seconds later she hit the back of Mrs. Brown's vehicle. Ms.

2

Lambert also testified that while the three women were waiting for the police officer to arrive at the scene of the accident, Mrs. Brown told her that she "had contacted Ms. LeBlanc's car, and then she felt me [Ms. Lambert] contact her car." Mrs. Brown denied making such a statement.

Richard Fox, an accident reconstruction expert with Acadiana Research and Reconstruction in Lafayette, Louisiana, testified on behalf of the Browns and concluded that there was no evidence of two impacts on the rear bumper of Ms. LeBlanc's car or on the front bumper of Mrs. Brown's car. He reached this conclusion based on his examination of the photographs taken of the various vehicles involved in the accident as well as the damage estimates for each vehicle. Of particular importance to Mr. Fox was the damage to the rear quarter panel of Mrs. Brown's vehicle on the driver's side and the fact that the damage to the immediate rear of the vehicle was on the driver's side. He explained that this damage represented an "offset collision" wherein Ms. Lambert veered slightly to the left when she realized a collision was about to occur. The damage to the side of Mrs. Brown's vehicle was caused, not from direct impact, but from the crinkling effect of the offset impact in the rear. He noted that the LeBlanc vehicle had no similar damage. Additionally, he testified that the other damage to Mrs. Brown's vehicle was consistent with this type of impact.[1] Observing that the damage to Ms. LeBlanc's vehicle resembled more of a "flat hit," Mr. Fox concluded that the damage reflected was not caused in this accident. Mr. Fox also recognized that the damage to the front of Ms. Lambert's vehicle was significantly more than that to either of the other two

_____

[1]In addition to the damage to the bumper and side panel, the absorber and metal plate behind the absorber, the frame horn on the driver's side, and the tailpipe and muffler on Mrs. Brown's vehicle were damaged to the extent that they had to be replaced.

vehicles. He estimated that Ms. LeBlanc's vehicle impacted Mr. Robinson's vehicle at less than five miles per hour, given the lack of damage to the forward vehicle and the fact that the air bag did not deploy; and that Ms. Lambert's vehicle was traveling at approximately seventeen miles per hour, given the fact that it pushed the Brown vehicle into the LeBlanc vehicle with sufficient force to cause significant damage. He saw no evidence of two impacts with the LeBlanc vehicle.

On the other hand, Stephen A. Killingsworth, also an accident reconstruction expert from Lafayette, Louisiana, testified on behalf of the defendants and said that in the "most probable of the scenarios that I've looked at there was a dual impact to the LeBlanc vehicle." Mr. Killingsworth had available all the information upon which Mr. Fox relied, and additionally, researched the design systems of each of the vehicles involved in the accident. He agreed with Mr. Fox's conclusion that the center of the Lambert vehicle impacted the driver's side of the Brown vehicle and that this caused the buckling of the left rear quarter panel. He also acknowledged that the impact caused sufficient damage to require the various components of the Brown vehicle to be replaced. When he turned to the analysis of the rear of the LeBlanc vehicle, Mr. Killingsworth noted little damage to that vehicle. He concluded that this lack of damage could be attributed to the fact that, unlike the Brown and Lambert vehicles, the bumpers of the Brown and LeBlanc vehicles were on the same level. However, noting that the right front of the Brown vehicle had some damage and that its hood was ajar, he concluded that a prior impact had occurred. Mr. Killingsworth claimed in his testimony that while he was aware that the right side of Mrs. Brown's vehicle had some damage, he initially could not determine whether it was old or new damage until he listened to the testimony at trial. He reached his two-impact

4

conclusion while at lunch before being called to testify. This is despite the fact that he had been long identified as the defendants' expert on the nature of the collisions.

On cross-examination, Mr. Killingsworth testified that in one of the scenarios he considered before trial, he concluded that the Brown vehicle struck the LeBlanc vehicle at the exact moment the Lambert vehicle struck hers. Additionally, he acknowledged that his conclusions concerning the impact were based on a number of variables and/or unknowns, including the speed of the vehicles and the point at which either or both drivers engaged their brakes. He also acknowledged that at the time his deposition was taken, he did not believe the accident involved two impacts between the LeBlanc and Brown vehicles, and he only changed his mind based on the testimony he heard at trial.

Regardless of the mechanics of the accident itself, Mrs. Brown did sustain serious personal injuries, although the full extent of the injuries and the need for future medical treatment were issues at trial. At the time of the accident, Mrs. Brown was twenty-four years of age, with an eighteen-month-old daughter, and had no significant previous medical history. Two days after the accident, she presented herself to Dr. Richard P. Sylvester, D.C., a Lafayette, Louisiana chiropractor, for evaluation and treatment of her mid-back complaints of pain. Dr. Sylvester saw Mrs. Brown seven times between January 4, 2006 and March 8, 2006, treating her condition with adjustments, heat, massage, and electrical therapy. On January 9, 2006, Mrs. Brown underwent an MRI pursuant to Dr. Sylvester's referral, which showed that at the T11-T12 level there was disc desiccation with a mild disc space narrowing and a mild diffuse disc bulge.

5

While seeking treatment from Dr. Sylvester, Mrs. Brown also began seeing Dr. Robert D. Franklin, M.D., a Lafayette, Louisiana physiatrist. Dr. Franklin first saw Mrs. Brown on February 23, 2006. According to Dr. Franklin, she presented herself to him with complaints of cervical neck pain and stiffness throughout her back, with pain in both her lower back muscles and over the lower lumbar region. His initial examination produced objective evidence of soft tissue injury, and he prescribed anti-inflammatory medication to treat her complaints.

At an April 11, 2006 visit, Dr. Franklin observed that Mrs. Brown was guarded in her movements and was walking with a limp. He concluded that the manner in which Mrs. Brown was moving demonstrated her attempt to avoid pain in her activities and that the limp was caused by a spasm in the right lumbar paraspinals. Dr. Franklin prescribed pain medication and ordered a thoracic and lumbar MRI scan. That April 12, 2006 MRI revealed that at the T11-T12 disc level, there was disc desiccation, mild disc space narrowing, and a small disc bulge with an annular tear in the ligament. Dr. Franklin then referred Mrs. Brown to Dr. Patrick Juneau, III, a Lafayette, Louisiana neurosurgeon, for an evaluation.

Dr. Juneau first saw Mrs. Brown on March 3, 2006. Based on his examination of the patient as well as the MRI test results, Dr. Juneau confirmed Dr. Franklin's opinion with regard to the disc protrusion between the T11-T12 disc level and attributed that injury to the accident of January 2, 2006. Dr. Juneau found this condition consistent with her complaints of pain in the lower back, explaining that such an injury can cause pain in the lower part of the back, between the shoulder blades, and even around the front of the body. At that time, he recommended that the injury be treated conservatively and that she be followed by his office.

6

On July 11, 2006, Mrs. Brown returned to Dr. Franklin, who testified that on that day his patient continued to complain of mid and low back pain, suffered from a decreased range of motion on forward flexion, and had a guarded motion when extending. He continued her on anti-inflammatory and pain medication and suggested physical therapy. Mrs. Brown last came to his office on August 9, 2006, when his physician's assistant noted in the records that she was responding to physical therapy.

Dr. Tracy Hebert, Ph.D., an expert in the field of physical therapy, testified that Mrs. Brown had participated in eighteen sessions of physical therapy at the Boulet Rehabilitation facility in Lafayette, Louisiana between July 13, 2006 and September 7, 2006. In those sessions, she received deep tissue massage, manual treatment, heat treatments, electrical stimulation, therapeutic exercise, and instruction in home exercises. According to Dr. Hebert, Mrs. Brown reported that she was undergoing daily problems, including extra pain when lifting heavy weights, difficulty sitting in a chair for long periods, difficulty traveling, and extra pain when standing. In the last three visits for physical therapy, Mrs. Brown did not report pain, and when she was discharged on September 7, she had significantly less pain although she reported occasional increased pain when picking up her daughter, who was then two years old and weighed twenty-five pounds. Upon discharge she was given a home exercise program. Dr. Hebert testified that Mrs. Brown's pain complaints were consistent with disc pathology at T11-T12.

Mrs. Brown testified that even after physical therapy, she continued to have problems sitting, problems picking up her daughter, and back pain. At the time of

7

trial, she was continuing with the exercise program recommended by Dr. Hebert and was working out three times per week.

Mrs. Brown began seeing Dr. David L. Weir, M.D., a neurologist at the Southeast Neuroscience Center in Lafayette, Louisiana, on October 2, 2006. His medical records were introduced into evidence. Following the first examination, Dr. Weir's records reflect that Mrs. Brown suffered from pain in the thoracic spine, thoracic paraspinal muscle spasms, decreased sensation in the right distal leg and foot, and headaches due to her thoracic and cervical strain. His plan for her treatment included muscle relaxers, anti-inflammatories, and trigger point and botox injections to relieve the muscle spasms. He also ordered an MRI of the thoracic area. That October 2, 2006 MRI confirmed the findings of the MRI performed on April 12, 2006, again revealing a disc bulge with an annular fissure and disc degeneration at T11-T12. At her next visit with Dr. Weir, on October 19, 2006, she continued to complain of neck and thoracic pain, with fairly severe headaches about once a month, muscle spasms in the cervical paraspinal and trapezius muscles, and spasms in the thoracic paraspinal muscles.

Based on these complaints and his findings, Dr. Weir continued the treatment plan already in place of muscle relaxers, anti-inflammatories, botox injections, and trigger point injections and added Imitrex and Ultracet for pain. At the follow-up visit on January 10, 2007, Dr. Weir's examination revealed that Mrs. Brown was tender and had spasms in the right cervical paraspinal muscles. Dr. Weir noted that she was unable to have the scheduled botox injections because she was then

8

pregnant.[2]  He did inject a combination of Kenalog and Marcaine into the areas that were in spasm.

At the May 15, 2007 follow-up visit, Dr. Weir noted that Mrs. Brown's neck was supple, with a good range of motion, but that she was having tingling down her right leg.  On June 27, 2007, when Dr. Weir again sent Mrs. Brown for an MRI, her thoracic spine imaging could not be completed because she was in her third trimester of pregnancy.  At the September 4, 2007 examination, Dr. Weir's records indicate that Mrs. Brown had spasms of the cervical and thoracic paraspinal muscles.  In an effort to relieve the spasms, Dr. Weir told her to continue RS Medical Stimulation and referred her to Dr. Denise Florane, a local chiropractor.  After examining Mrs. Brown on November 12, 2007, Dr. Weir's records reflect that Mrs. Brown developed a headache, which seemed to follow increasing neck pain, and that an examination revealed that she continued to have "spasms of the cervical paraspinal muscles, specifically the upper, mid, and especially the lower thoracic muscles."  At that time, Dr. Weir recommended an anti-inflammatory, a muscle relaxant, and massage therapy.  He also recommended botox injections of the cervical paraspinal muscles once she stopped breast-feeding.

On Dr. Weir's recommendation, Mrs. Brown began treatment with Dr. Denise Florane, D.C., a chiropractor at the Mosaic Chiropractic Clinic in Lafayette, Louisiana.  Between September 24, 2007, and March 24, 2008, Dr. Florane treated Mrs. Brown nineteen times.

Dr. Juneau's office records from December 5, 2007 reflect that he had reviewed Mrs. Brown's MRIs of April 12, 2006; October 2, 2006; January 9, 2007; and June

_____

[2]Mrs. Brown gave birth to her second child, a daughter, in August of 2007.

9

27, 2007. Based on his review of these test results, he concluded that Mrs. Brown suffered from a disc protrusion at T11-T12. He also concluded that because Mrs. Brown was having significant and persistent pain, and her symptoms were not getting better, she was a candidate for a T11-T12 disc excision with instrumented fusion, which would cost approximately $100,000.00. Dr. Juneau's records further reflect his conclusion that if Mrs. Brown were to undergo the operation, she would suffer a degree of permanent disability that would preclude her from being able to perform the lifting activities required of a nurse. At the same time, the records reveal the doctor's conclusion that if Mrs. Brown did not have the surgery, and if she continued to have persistent and rather severe thoracolumbar pain, she would still be unable to work as a nurse.

In his trial testimony, Dr. Juneau explained that Mrs. Brown's succession of MRIs consistently revealed the presence of a protruding disc at T11-T12. According to the doctor, such a protruding disc could cause pain in the lower part of the back, between the shoulder blades, and could wrap around the stomach. Based on the lack of history of back problems, he was of the opinion that the herniation at T11-T12 is caused by the January 2, 2006 car accident. Dr. Juneau further opined that, given the fact that Mrs. Brown continued in pain years post-accident, the injury was not going to heal on its own, and her only options were to live with the pain for the rest of her life or consider surgical intervention. Dr. Juneau also testified that he had spoken with Mrs. Brown by telephone on April 20, 2008, and she informed him that the pain had now extended to the front of her body. He indicated that because the pain was wrapping around to the front, it made the recommendation of surgery more valid. Although his December 5, 2007 office notes state that the cost of such an operation

10

would be in the range of $100,000.00, at trial Dr. Juneau suggested that the estimated cost of the surgery would be $80,000.00.

Mrs. Brown testified at trial that she was still having pain, primarily when required to sit for any period of time. She stated that her entire back constantly felt like it had a "charley horse" and she continued to suffer from severe headaches. According to Mrs. Brown, she definitely intended to have the surgery Dr. Juneau recommended, but she had not had the surgery as of the time of trial.

Mr. Brown testified in support of both his wife's claim and his loss of consortium claim. According to Mr. Brown, he is a self-employed general contractor who works forty to fifty hours per week outside the home, but when Mrs. Brown has doctor's appointments, he has to leave his work to take care of their two daughters. He testified that he normally arrives home each evening around 6:00 p.m. and helps with the cooking and care of the two children because Mrs. Brown is in constant pain. He testified that Mrs. Brown is often "short" with him and the children since the accident and that family road trips are much harder on her than before. For that reason, they seldom see his family members who are scattered from Alabama to Louisiana.

The defendants' rebuttal evidence consisted of surveillance videos depicting Mrs. Brown in her daily activities that were taken by a private investigator and the testimony of Brenda McCall, a payroll bookkeeper at Lafayette Total Eyecare, in Lafayette, Louisiana. The surveillance videos, which were taken on October 30 and 31, 2007; December 19, 2007; and February 19, 20, and 21, 2008, depict Mrs. Brown entering and exiting various buildings, carrying a baby carrier, placing the baby carrier in the car and later removing it, going shopping for groceries and at

11

department stores, placing her groceries and other purchases in her vehicle, carrying a large bag over her shoulder, and going to the gym for times that ranged from twenty minutes to an hour and twenty minutes. In the October 31, 2007 video, Mrs. Brown appeared to have difficulty lifting the baby carrier from her grocery cart, and three times placed her hand in the small of her back. Ms. McCall testified that Mrs. Brown worked at Lafayette Total Eyecare from April 17, 2006, until June 1, 2006, and that during that time, she never heard Mrs. Brown complain of a physical injury.

Trial began on April 22, 2008, and the jury responded to the interrogatories propounded to it on April 24, 2008, in the following manner:

1.  Do you find that Caroline Lambert was negligent or at fault in the incident of January 2, 2006?

    Yes ____√____  No _____

    If your answer to Question Number 1 was "yes," please proceed to Question Number 2. If your answer to Question Number 1 was "no," please have the jury foreperson sign where indicated and return to the judge.

2.  Was the negligence or fault of Laura Cox Brown in causing a sudden emergency the cause of the incident of January 2, 2006?

    Yes _____  No ____√____

    If your answer to Question Number 2 was "yes," please have the jury foreperson sign where indicated and return to the judge. If no, please proceed to Question Number 3.

3.  Do you find that Laura Cox Brown suffered injuries as a result of the fault and/or negligence of Caroline Lambert?

    Yes ____√____  No _____

    If your answer to Question Number 3 was "no," please have the jury foreperson sign his or her name in the appropriate place at the end of this form, and return it to the Court. If your answer to question Number 3 was "yes" please proceed to question number 4.

4.   Do you find that Laura Cox Brown's injuries were the sole result of her actions in rear-ending the Peggy LeBlanc vehicle?

Yes _____     No _____√_____

If you answer "yes," to question number 4, please have the jury foreperson sign where indicated and return it to the Judge. If your answer to question 4 is "No," please proceed to question number 5.

5.   Please state the percentage of negligence, if any, which you attribute to the defendant, Caroline Lambert, and to the plaintiff, Laura Cox Brown. (Please note the total percentages assigned must equal to 100%).

Laura Cox Brown __50%__
Caroline Lambert __50%__

6.   What amount, in dollars and cents, do you award to Laura Cox Brown?

| | |
|---|---|
| Physical Pain (past and future) | $ 25,000.00 |
| Mental Anguish (past and future) | $       .00 |
| Disability | $       .00 |
| Past Medical Expenses | $ 26,000.00 |
| Future Medical Expenses | $ 60,000.00 |
| Loss of Enjoyment of Life | $       .00 |

7.   What amount, in dollars and cents, do you award to Mr. C. Linzay Brown?

Loss of consortium                    $       .00

The trial court incorporated these findings in its judgment and taxed the costs of the litigation to the Browns.

After the trial court signed the judgment on September 8, 2008, the Browns perfected this appeal. In their appeal, the Browns assert that the assessment of fifty percent fault on the part of Mrs. Brown was error, that the damage awards are inadequate, and that the trial court erred in assessing all costs of the litigation to them.

**OPINION**

We evaluate negligence actions under a duty/risk analysis. To be successful a plaintiff must establish by a preponderance of the evidence the five prongs of the duty/risk analysis: (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, (3) the breach of that duty by the defendant was a cause-in-fact of the plaintiff's injuries, (4) the breach was the legal cause of the harm suffered by the plaintiff, and (5) the plaintiff suffered damages. *Hanks v. Entergy Corp.*, 06-477 (La. 12/18/06), 944 So.2d 564. If the plaintiff fails to establish any of these elements by a preponderance of evidence, he or she may not recover.

*Assessment of Fault*

The duty element involved in this litigation is set forth in La.R.S. 32:81(A), which provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway." If a following motorist strikes the forward vehicle from the rear, he or she is presumed to have breached the duty imposed by La.R.S. 32:81(A). *Mart v. Hill*, 505 So.2d 1120 (La.1987).

> A following motorist may, however, rebut the presumption by demonstrating that he or she had his car under control, closely observed the preceding vehicle, and followed at a safe distance under the circumstances, or by proving that the driver of the lead car negligently created a hazard which the following motorist could not reasonably avoid. *McCullin v. U.S. Agencies Cas. Ins. Co.*, 34,661 (La.App. 2 Cir. 5/9/01), 786 So.2d 269. The following motorist bears the burden of showing he was not negligent. *Wheelis v. CGU Ins.*, 35,230 (La.App. 2 Cir. 12/7/01), 803 So.2d 365.

*Menard v. Federated Mut. Ins. Co.*, 05-85, pp. 3-4, (La.App. 3 Cir. 6/22/05), 906 So.2d 746, 750, *writ denied*, 05-1925 (La. 3/10/06), 925 So.2d 506.

14

In answering the first and second interrogatories as it did, the jury found that the plaintiffs established the first four elements of the duty/risk analysis by a preponderance of the evidence. Additionally, in its answer to the third interrogatory, the jury found that the plaintiffs had established the fifth element of the duty/risk analysis by a preponderance of the evidence. That is to say, the jury concluded that Ms. Lambert was negligent in causing the accident sued upon and the resulting injuries to Mr. and Mrs. Brown; that Mrs. Brown did not cause a sudden emergency that contributed to the cause of the accident, i.e., that she did not negligently create a hazard that Ms. Lambert could not reasonably avoid; and that the Browns suffered injuries as a result of Ms. Lambert's negligence or fault. Although not specifically stating so, the jury implicitly rejected the "two-impact" theory asserted by the defendants. The instruction following the third interrogatory should have directed the jury to proceed immediately to Interrogatory Number Six and award damages. That is to say, the jury's inquiry should have ended at this point. Instead, the instruction directed the jury to answer the next interrogatory.

The apparent premise of the fourth interrogatory, in referring to Mrs. Brown's "actions in rear-ending the Peggy LeBlanc vehicle" is that Ms. Brown created a hazard that Ms. Lambert could not avoid by striking Ms. LeBlanc's vehicle before Ms. Lambert impacted her vehicle—a factual scenario clearly rejected by the jury in its answer to the second interrogatory. While the fourth interrogatory can be interpreted in numerous ways, the interpretation consistent with the jury's answers to the first three interrogatories is that, in answering this interrogatory in the negative, the jury simply reaffirmed what it had already stated—that the sole cause of this accident and the resulting injuries was the negligence or fault of Ms. Lambert. Given

15

the answers to the first three interrogatories, the fourth interrogatory was basically redundant. Still, the instruction that followed this interrogatory created a critical error in that it too should have directed the jury to proceed immediately to Interrogatory Number Six and award damages. Instead, it directed the jury to answer the next interrogatory, an error that, when followed by the jury, caused the jury's verdict to become inherently incorrect. Despite having found that the sole cause of the accident was the negligence or fault of Ms. Lambert, the jury assigned fifty percent of the fault in causing the accident to Mrs. Brown.[3]

Normally, when we find that a jury interrogatory is tainted with legal error, we set aside the jury finding associated with that legal error and perform a *de novo* review of the record as it relates to that error. *State ex rel. Dept. of Transp. and Dev. v. Wade*, 07-1385 (La.App. 3 Cir. 5/28/08), 984 So.2d 918, *writ denied*, 08-1896 (La. 12/12/08), 997 So.2d 561. Here, based on the responses to the first four interrogatories, the trial court erred in instructing the jury to answer Interrogatory Number Five. In performing a *de novo* review with regard to the issue of comparative fault, we conclude that the answers to the first four interrogatories are supported by the record and that the jury erred in finding Mrs. Brown fifty percent negligent in causing the accident sued upon. That being the case, we set aside the finding of negligence on the part of Mrs. Brown and assign one hundred percent of the fault in causing the accident to Ms. Lambert.

---

[3]It is significant to note that the interrogatory is couched in terms of "negligence" in causing the accident and not in terms of causation of injuries. Had the interrogatory referred to causation of injuries, the jury's finding might have given credence to the argument that there was a first impact and that some of Mrs. Brown's injuries might have been caused by the first impact instead of the second.

*General Damages*

The Browns contend that the jury erred in awarding them only $25,000.00 in general damages. They argue that the $25,000.00 award for Mrs. Brown's past and future physical pain and suffering should be increased and that this court should make awards for Mrs. Brown's past and future mental anguish, disability, and loss of enjoyment of life and for the loss of consortium suffered by Mr. Brown.

In considering whether the award of general damages is excessive, we are guided by the decision in *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994), wherein the supreme court noted that "the discretion vested in the trier of fact is 'great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Under *Youn*, "[t]he initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the 'much discretion' of the trier of fact." *Id*. at 1260. Only after the initial inquiry is answered in the affirmative should the appellate court increase or reduce the award. *Id*.

Mrs. Brown was only twenty-four years old at the time of the accident, and her uncontroverted testimony was that she had never had any back pain before the accident. Now she has a protruding disc between T11-T12, which Dr. Juneau testified will not heal on its own. At trial, which occurred two years after the accident, she had ongoing, daily problems resulting from the accident: problems picking up her children or lifting any heavy weight, pain when sitting or standing for long periods of time, and severe headaches. Mrs. Brown testified that some days are better than others, but that her pain averages a five out of ten on a daily basis. She

has sought every type of medical care available to her and diligently followed the regimen of physical therapy that was recommended. The record before us, including the video surveillance, shows that Mrs. Brown is in pain but makes the best of her situation, continuing with her daily activities despite the pain and working hard to improve her injuries. With no expectation that the protruding disc will improve, Mrs. Brown is facing a serious surgery or daily suffering for the rest of her life. Given the record before us, we conclude that the award of $25,000.00 in general damages is abusively low.

As the jury's answer to the sixth interrogatory indicates, the award of $25,000.00 was only for past and future physical pain. The jury awarded nothing for her corresponding mental anguish, disability, or loss of enjoyment of life. The supreme court has held that when a jury's award for damages is excessively low, even when the jury awards no damages for a particular item, this court can only increase the award "to the lowest amount which is reasonably within the court's discretion." *Ryan v. Zurich Am. Ins. Co.*, 07-2312, p. 7 (La. 7/1/08), 988 So.2d 214, 219. Accordingly, we will raise Mrs. Brown's general damage award[4] to the lowest point that was reasonably within the discretion of the trier of fact. *Youn*, 623 So.2d 1257. In adjusting the award, we will refer to prior awards in similar cases to determine the lowest point of an award within that discretion. *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976). Considering the effects of the particular injury on Mrs. Brown, and in particular her youth and the consequent lengthy extent of her probable suffering, we award her general damages of $250,000.00. *See Clark v. Matthews*, 04-848 (La.App. 5 Cir. 1/11/05), 891 So.2d 799, *writ denied*, 05-473 (La. 4/22/05), 899

---

[4]Rather than award separate amounts for each individual category, we will award one amount for general damages.

So.2d 577; *Franz v. First Bank Sys., Inc.*, 03-448 (La.App. 4 Cir. 2/11/04), 868 So.2d 155, *writs denied*, 04-648, 04-649 (La. 4/30/04), 872 So.2d 493, 496; *Desselle v. LaFleur*, 03-562 (La.App. 3 Cir. 2/4/04), 865 So.2d 954; *Sepulvado v. Turner*, 37,912 (La.App. 2 Cir. 12/10/03), 862 So.2d 457, *writ denied*, 04-89 (La. 3/19/04), 869 So.2d 855; *Scott v. Roberts*, 03-435 (La.App. 3 Cir. 10/1/03), 856 So.2d 1258, *writ denied*, 03-3028 (La. 1/30/04), 865 So.2d 80*; Day v. Ouachita Parish Sch. Bd.*, 35,831 (La.App. 2 Cir. 8/8/02), 823 So.2d 1039, *writ denied*, 02-2532 (La. 12/19/02), 833 So.2d 343; *Kerrigan v. Imperial Fire and Cas. Ins. Co.*, 99-603, 99-604 (La.App. 3 Cir. 11/3/99), 748 So.2d 67, *writ denied*, 99-3410 (La. 2/4/00), 754 So.2d 236.

The jury made no award to Mr. Brown for his loss of consortium. The compensable elements of damage in a claim for loss of consortium of a spouse include loss of love and affection, loss of companionship, loss of material services, loss of support, impairment of sexual relations, loss of aid and assistance, and loss of felicity. *Ferrell v. Fireman's Fund Ins. Co.*, 96-3028 (La. 7/1/97), 696 So.2d 569. Mr. Brown testified at trial concerning his wife's shortness with him, stating that before the accident and her resulting back pain, she had not behaved that way toward him. Further, Mr. Brown is required to take on more of the household and childcare responsibilities, to the detriment of his career and responsibilities as a self-employed contractor, because Mrs. Brown is exhausted from dealing with her pain by the end of the day. Her inability to sit for long periods of time means that they are not able to make road trips, and, therefore, he has not seen his immediate family, who live in other areas of the state and in nearby states, as often as he did before the accident. We find an award of $25,000.00 to be the lowest amount that was reasonably within

19

the discretion of the trier of fact under the circumstances of this case. *See Scott*, 856 So.2d 1258.

***Special Damages***

The Browns also contend that the jury's award of $60,000.00 in future medical expenses is unreasonably low. We agree.

The plaintiff has the burden of proving, by a preponderance of the evidence, entitlement to special damages such as future medical expenses. *Thibeaux v. Trotter*, 04-482 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31. In meeting her burden of proof on this issue, Mrs. Brown must show that more probably than not, these expenses will be incurred and she must present medical testimony that they are indicated and the probable cost of these expenses. *Veazey v. State Farm Mut. Auto Ins.*, 587 So.2d 5 (La.App. 3 Cir. 1991). The jury's award of such special damages is reviewed under the manifest error standard of review. *Thibeaux*, 896 So.2d 31.

Here the jury awarded Mrs. Brown $26,000.00 in past medical expenses, almost one hundred percent of the $26,058.45 in medical expenses that she had incurred as of the date of trial. Thus, the jury obviously believed that Mrs. Brown's injuries required medical intervention and that the treatment she sought was appropriate. However, the award of $60,000.00 in future medical expenses bears no relation to the testimony or documentary evidence concerning her future medical expenses.

With regard to future medical treatment, Mrs. Brown testified at trial that she had a scheduled appointment with Dr. Wier in June of 2008. Dr. Wier's records reflect that his charges for medical visits range from $126.00 to $198.00. The only

other evidence concerning Mrs. Brown's future medical expenses was presented by Dr. Juneau. According to Dr. Juneau, Mrs. Brown's condition had reached the point that her choices were to live with the pain and disability for the rest of her life or to submit herself to surgery to alleviate the pain. The first choice would obviously require continued medical treatment which would be similar in cost to that which she had been receiving, while the second would range between $80,000.00 and $100,000.00. In either situation, according to Dr. Juneau, Mrs. Brown's physical activities would be limited in that she would suffer a permanent disability. Although the defendants suggested that Dr. Juneau's recommendation of surgery was primarily based on a mistaken belief that Mrs. Brown had told him, in a phone conversation in April of 2008, that the pain was wrapping around to the front of her body, Dr. Juneau's office note of December 5, 2007, reflects that he recommended the surgery on that date, long before his April 2008 conversation with Mrs. Brown.

Mrs. Brown testified that she would have the surgery in order to rid herself of the pain she has had since the accident. There was no evidence presented to contradict or rebut her testimony. Furthermore, it is understandable that she had not yet submitted herself to surgery by the date of trial, given the fact that she gave birth to her second child in August of 2007, and Dr. Juneau first recommended the surgery in December of 2007.

We find the jury's verdict on this issue to be inconsistent with the evidence presented at trial. Specifically, the award of $60,000.00 in future medical expenses bears no relation to any of the evidence presented. In light of this internally inconsistent verdict, we conclude that the jury manifestly erred in failing to award the full value of the medical treatment that was established at trial to be medically

necessary and we amend the award to $80,126.00, the minimum amount of future medical expenses established at trial.

*Loss of Earning Capacity*

The trial on the merits began on Tuesday, April 22, 2008. On Thursday, April 17, 2008, the defendants filed two motions *in limine*, seeking to exclude testimony from Glenn M. Hebert, a Lafayette, Louisiana vocational rehabilitation counselor, and Dr. R. Douglas Womack, Ph.D., a Lafayette, Louisiana consulting economist, concerning Mrs. Brown's loss of earning capacity. The trial court held a hearing on these motions the day before the trial was to begin and, at the close of that hearing, granted the motions to exclude the testimony. Immediately before the trial began the next day, the trial court clarified its ruling, stating that Mr. Hebert could not testify at all and that Dr. Womack could not testify on any wage issue.[5]

In response to this ruling, the Browns moved to proffer the excluded evidence. The trial court did not allow them to make a proffer on the record. Instead, it required the Browns to submit their evidence by affidavit. Pursuant to the trial court's order, the Browns proffered the affidavit of each excluded expert; the affidavit of Dr. Juneau stating that Mrs. Brown is permanently restricted to "light duty" as a result of her injuries in the accident; and the affidavits from Mr. and Mrs. Brown setting forth what their testimony would have been regarding Mrs. Brown's loss of future earning capacity. The defendants countered these affidavits with some of the pleadings addressing the issue; excerpts from Mrs. Brown's pretiral deposition; excerpts from Mr. Hebert's pretrial deposition; excerpts from a deposition of Dr. Roger W. Kula,

_____

[5]On December 10, 2008, the trial court signed a judgment stating that it granted the motions *in limine* "excluding any and all evidence and/or testimony regarding vocational opportunities and/or salaries sought to be introduced by Plaintiff for the field of nursing" from either Mr. Hebert or Dr. Womack. However, the oral ruling issued immediately before trial began was much more extensive in that the trial court prohibited any testimony from the two experts concerning lost wages.

MD, a New York physician deposed by the Browns who did not testify at trial; a copy

of an order from the Western District of Louisiana United States District Court, in

*Mulligan v. Chevron USA, Inc.*, 06-1062 W.D.La. (7/27/07), in which the trial court

ruled that Mr. Hebert would not be allowed to testify in the matter before that court;

a transcript of the July 25, 2007 *Daubert* hearing contesting Mr. Hebert's ability to

testify in *Mulligan*; and excerpts from Mr. Hebert's deposition in this case.

The Browns argue on appeal that the trial court erred in granting the motions

*in limine* and in not allowing their experts to testify. We agree.

Louisiana Code of Evidence Article 702 provides:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion or
> otherwise.

This rule is subject to the balancing requirements of La.Code. Evid. art. 403, which

allows relevant evidence to be excluded "if its probative value is substantively

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

the jury." *Id.* The trial judge is vested with broad discretion in ruling on the scope

of expert testimony. La.Code Evid. art. 702.

In their motions before the trial court as well as before us on appeal, the

defendants do not argue that the evidence at issue should have been precluded based

on the balancing requirement of La.Code Evid. art. 403. Instead, they argue that the

testimony **is** not admissible under the standards set out in *Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993).

We find that the defendants' reliance on *Daubert* is clearly without merit.

*Daubert* is applicable where the complaint is to the methodology or some new

23

scientific or medical technique that may be used by an expert witness in his or her testimony. Here the defendants complain of nothing more than the correctness of the factual basis underlying the experts' opinions. That being the case, the *Daubert* factors are not relevant. *Menard v. Lafayette Ins. Co.*, 09-29 (La.App. 3 Cir. 6/3/09), 13 So.3d 794, *writ granted*, 09-1869 (La. 11/20/09), 25 So.3d 804.

The trial court did not base its decision on the defendants' *Daubert* argument. Instead, it concluded that neither witness could testify concerning loss of earning capacity because, at the time of trial, Mrs. Brown had not enrolled in nursing school and was not then a nutritionist. That being the case, the trial court concluded, any testimony concerning lost wages in either of these two fields would be based on conjecture.

The general rule is that "the factual basis for an expert's opinion goes to the credibility of the testimony, not its admissibility, and it is up to the opposing party to examine the factual basis of the opinion in cross-examination." *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8 Cir.1988). Appellate review of a question of law is simply a decision as to whether the trial court's decision is legally correct or incorrect. *Jim Walter Homes, Inc. v. Jessen*, 98-1685 (La.App. 3 Cir. 3/31/99), 732 So.2d 699. The fact that Mrs. Brown had not enrolled in nursing school does not, as a matter of law, preclude the Browns from presenting expert testimony on whether Mrs. Brown suffered a loss of earning capacity because she is now unable to become a nurse. The factual basis of the experts' opinions is a credibility issue that should have been resolved by the jury. *Loudermill*, 863 F.2d 566. Accordingly, we find that the trial court erred in granting the defendants' motion *in limine* to exclude the testimony of Mr. Hebert and Dr. Womack.

24

We need not remand this matter for a new trial on this issue because the proffer provides us with a complete record. When a complete record has been made through a proffer, "the appellate court is able to conduct a *de novo* review of the record, including the proffered evidence, to render a decision on appeal." *Williams v. Williams*, 06-2491, p. 10 (La.App. 1 Cir. 9/14/07), 970 So.2d 633, 640.

Because the trial court placed no limits on the content or amount that could be submitted in the parties' proffers, we conclude that the record is sufficiently complete to allow us to render a judgment on the issue of Mrs. Brown's loss of future earning capacity without a remand for additional evidence. *Foley v. Entergy La., Inc.*, 06-983 (La. 11/29/06), 946 So.2d 144. Accordingly, we review the record *de novo* to award the appropriate damages for any loss of Mrs. Brown's future earning capacity the Browns may have established. *Williams*, 970 So.2d 633.

This court explained the meaning of loss of earning capacity in *Batiste v. New Hampshire Ins. Co.*, 94-1467, p. 3-4 (La.App. 3 Cir. 5/3/95), 657 So.2d 168, 170, *writ denied,* 95-1413 (La. 9/22/95), 660 So.2d 472 (citations omitted):

> Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity.

> In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition.

25

The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiff's condition prior to the accident, his work record prior to and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work life remaining, inflation, and the plaintiff's employment opportunities before and after the accident.

Mrs. Brown testified at trial that she graduated from University of Louisiana at Lafayette in 2004 with a degree in dietetics, having earned a 3.69 grade point average. When she graduated, she did not become employed in the dietetics field both because she needed fifteen hours in graduate courses before she could get into the internship program and because she was already pregnant with their first daughter. Mrs. Brown's proffered affidavit asserts that in December of 2005, she spoke with Bonnie Johnson, the head of Louisiana State University-Eunice's nursing program; that Ms. Johnson had reviewed Mrs. Brown's transcripts from University of Louisiana at Lafayette and prepared a degree plan outlining the courses that would apply toward Mrs. Brown's nursing degree; and that Ms. Johnson had advised Mrs. Brown that she was eligible for the "Fast Track" nursing program and could graduate in twenty-four months. Mrs. Brown further asserted in her affidavit that she had obtained a formal application before the January 2, 2006 accident which had a March 1, 2006 deadline for submission, and that she fully intended to pursue a nursing career.

Dr. Juneau's proffered affidavit assets that Mrs. Brown "is permanently restricted to 'light duty' as a direct result of the injuries associated with her motor vehicle accident on January 2, 2006," and that her medical restrictions related to her injuries would prohibit her from becoming a nurse. The trial evidence separate from the proffer supports this conclusion as well. Dr. Juneau's December 5, 2007 office

26

note, which was introduced into evidence at trial, reflects his conclusion that if Mrs. Brown were to undergo the operation she would suffer a degree of permanent disability that would preclude her from being able to perform the lifting activities required of a nurse, while if she did not did not have the surgery and continued to have persistent and rather severe thoracolumbar pain, she would still be unable to work as a nurse. The permanent disability testified to by Dr. Juneau is not controverted with any other medical evidence. In his proffered affidavit, Mr. Hebert agreed with Dr. Juneau's conclusion that Mrs. Brown's permanent injuries would preclude her from pursuing a nursing profession.

After reviewing the record as a whole, we accept Dr. Juneau's statement that Mrs. Brown will be permanently restricted to "light duty," and Mr. Hebert's assertion that this restriction prevents her from receiving a nursing degree. We also find credible Mrs. Brown's statement that she intended to earn a nursing degree. In making that finding, we place great emphasis on her former scholastic success. However, we note that there was no indication that Mrs. Brown is unable to pursue a career in dietetics because of the accident. Accordingly, we conclude that the proper measure of Mrs. Brown's lost earning capacity is the difference between a future career in nursing and one in dietetics.

Dr. Womack's proffered affidavit and report detail the economic value of Mrs. Brown's loss of earning capacity. Dr. Womack based his calculations on the theory that had the accident not occurred, Mrs. Brown could have become a certified nutritionist within two years after the accident and that had she done so, her earning capacity would have been approximately $43,680.00 per year; that if Mrs. Brown completed her training in dietary science and began working as a dietitian/nutritionist

27

in June of 2009, attributing this delay to her accident, her earning capacity would be only $31,830.00 per year; and that if Mrs. Brown had become a registered nurse in June of 2009, her earning capacity would be $51,750.00 per year. Because we have found that Mrs. Brown's accident did not impinge on her career as a dietitian/nutritionist, we base our evaluation of Mrs. Brown's loss of earning capacity on the salary difference between a dietitian/nutritionist earning $43,680.00 per year and a registered nurse earning $51,750.00, and assume that she would have begun working in either field in June of 2009, when her youngest child was almost two years old. Dr. Womack's report shows that the present value of Mrs. Brown's earning capacity as a dietitian/nutritionist earning $43,680.00 per year is $1,113,522.00, while the present value of her earning capacity as a registered nurse earning $51,750.00 per year is $1,262,951.00. Accordingly, we find that Mrs. Brown's loss of earning capacity has a present-day value of $149,429.00 and amend the trial court's judgment to reflect that new award.

### Court Costs

On March 20, 2008, the defendants tendered an offer of judgment pursuant to La.Code Civ.P. art. 970, wherein they offered to settle all claims arising from the automobile accident for $90,000.00. The Browns rejected this offer. On May 16, 2009, the defendants moved to tax all costs incurred since March 20, 2008, to the Browns because the ultimate judgment rendered at trial was less than twenty-five percent of the $90,000.00 offered tendered by the defendants on March 20, 2008. *See* La.Code Civ.P. art. 970(C). The trial court granted the defendants that relief, and the Browns argue on appeal that this assessment was in error. Given our findings on the

28

liability and quantum issues, we agree. We reverse the trial court judgment in this regard and tax all costs of court to the defendants.

## DISPOSITION

For the foregoing reasons, we reverse that portion of the trial court's December 10, 2008 judgment that reduced the monetary award in favor of Laura Cox Brown by fifty percent. We affirm those portions of the judgment finding sole fault on the part of Caroline E. Lambert and awarding $26,000.00 in past medical expenses to the plaintiffs, Laura Cox Brown and C. Linzay Brown. We amend the judgment to award the plaintiffs $250,000.00 in general damages; $80,126.00 in future medical expenses; $149,429.00 in loss of earning capacity; and $25,000.00 for Mr. Brown's loss of consortium. We also reverse that portion of the judgment taxing the Browns with court costs and tax the defendants, Caroline Lambert and Shelter Mutual Insurance Company, with all costs of court, including costs of this appeal.

**AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART, AND RENDERED.**