424 So.2d 536 (1982)
Karen T. VILLAVASO
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY.
No. 13320.
Court of Appeal of Louisiana, Fourth Circuit.
December 9, 1982.
Edward P. Lobman, Alice M. Lewis, Lobman & Carnahan, Metairie, for defendant/appellant.
Frank J. D'Amico, and Vincent J. Glorioso, Jr., New Orleans, for plaintiff/appellee.
Before SCHOTT, LOBRANO and AUGUSTINE, JJ.
*537 LOBRANO, Judge.
This lawsuit for damages was brought by Karen T. Villavaso against State Farm Mutual Automobile Insurance Company (hereinafter State Farm), Westside Oil Company, and Milton Retif, for injuries allegedly sustained in an automobile accident on January 17, 1980. At the time of the accident, Milton Retif, who was an employee of Westside Oil Company, was driving a vehicle owned by Westside Oil Company and insured under a policy issued by State Farm. Prior to trial, State Farm stipulated liability, and plaintiff agreed that any judgment would not exceed policy limits of $250,000.00. All of State Farm's insured were dismissed with prejudice. Therefore, the only issues presented to the trial court were the extent of injuries sustained in the January 17, 1980 accident, and the amount of damages assessable.
After a trial on the merits judgment was rendered in favor of the plaintiff in the amount of $250,000.00, the policy limits. From this judgment appellant, State Farm, appeals, contending that plaintiff (appellee) was injured in a subsequent accident on March 18, 1980 and that she failed to bear the burden of proving the extent of her injury in the January, 1980 accident.
Appellee testified that the impact of the first accident caused her to be thrown forward, backwards and side to side. Although she did not seek emergency medical care immediately thereafter, she began to feel a slight aching in the neck on the evening of January 17th which gradually grew worse with each passing day until she sought medical attention January 22nd.
Dr. Frank Gomila, a general practitioner, examined the plaintiff on January 22nd for complaints of head and neck pain radiating down into her right arm. His initial diagnosis was that plaintiff was suffering from an acute cervical strain, muscle spasms, possible ruptured cervical disc, loss of posterier lordotic curve, and headaches. He prescribed a cervical collar, medication, rest and treated plaintiff with ultrasonic physcotherapy. The ultrasonic treatments confirmed Dr. Gomila's diagnosis of a possible ruptured cervical disc when taken together with the radiculopathy and thus he referred her to Dr. Donald Richardson, a neurosurgeon for further diagnosis and treatment.
On January 25, 1980, Dr. Richardson examined plaintiff and diagnosed her injuries as a ruptured cervical disc, resulting from the January 17th accident. He initiated conservative treatment in conjunction with Dr. Gomila to which plaintiff responded favorably. His examination of March 10, 1980, revealed improvement and he requested that she return in six weeks. However, on March 18, 1980, she was involved in the second automobile accident and returned to Dr. Richardson on March 21, 1980. Dr. Richardson testified that plaintiff complained of cloudiness of thinking, blurred vision, nervousness, light headedness, unsteadiness, and a sensation of pressure behind her eyes all which were typical of post-concussion syndrome. According to Dr. Richardson, although she had probably sprained her neck in the second accident, that really wasn't her primary problem. He stated: "She was having symptoms primarily related to a head injury. She had a post-concussion syndrome."
Plaintiff's pain in her neck and right arm continued and on June 13, 1980 she consulted Dr. David Jarott another neurosurgeon. He examined her and ordered a myelogram and a discogram which revealed a C-5-6 ruptured cervical disc, which was subsequently surgically confirmed and removed at Touro Infirmary in August 1980.
Unfortunately, appellee's symptoms did not disappear, and a further examination in January, 1981 indicated another ruptured disc at C-4-5 which went undetected in the prior exam because of a "technically inadequate discogram". Dr. Jarrott testified that although she probably could benefit by additional surgery because of the frustrating experiences of pain after the first operation, he would recommend that she consider a second operation as a last resort only if symptoms are severe, continue or become intractable.
All three medical experts testified unequivocally that plaintiff's cervical disc injuries *538 resulted from the January 17th accident. This medical evidence was not contradicted.
Dr. Gomila testified, "At this time I feel that she undoubtedly suffered a cervical disc rupture as a consequence of the January accident. Therefore, Dr. Richardson and Dr. Jarrott both concur with my opinion that the initial damage to her neck was done in January and the March accident only served to exacerate all pre-existing symptoms, plus the possibility of further damage to her neck."
"Q. Did she exhibit more neck symptoms in the January 1980 accident or the March 1980 accident?"
"A. In the first accident, the one in January."
"Q. As a matter of fact, the cervical examination was rather normal when you examined her on March 21, 1980?"
"A. That's correct."
Similarly Dr. Jarrott testified, "I felt that the January accident was the original injury and that it had been an injury of the cervical disc ... she had undoubtedly sustained a cervical disc rupture as a consequence of the January accident."
"The jurisprudence pertaining to the burden of proof in instances involving multiple accidents is well settled. A tortfeasor is liable only for the direct and proximate results of his wrongful act."
* * * * * *
"The burden of proving both the existence of the injuries and the casual connection between them and the accident rests with the plaintiff. Such proof must be shown to a legal certainty and by a reasonable preponderance of the evidence. A mere possibility is insufficient." Stevens v. Gulf American Fire & Casualty Co., 317 So.2d 199 (La.App. 1st Cir. 1975) at p. 200.
In a personal injury suit, the test for determining whether the plaintiff proved the casual relationship between the accident and subsequent operations was whether the plaintiff showed through medical testimony that more probable than not subsequent operations were necessitated by trauma suffered in the accident. Polman v. Mohasco Corp., 371 So.2d 838 (La.App. 4th Cir.1979).
In the case at bar, appellant did not introduce any medical evidence to controvert or rebut appellee's proof of causation. As the trial judge wrote in a very well reasoned opinion "The plaintiff produced her three treating medical experts, whose testimony was unrebutted and uncontradicted by the defendant." Reasons for Judgment p. 1.
It is a well established rule in this jurisprudence that a witness' testimony which has not been controverted, nor contradicted and which has been accepted by the trial court as true must be accepted by the appellate court as true. B. Segall Co., Inc. v. Trahan, 290 So.2d 854, 857 (La.1974); Sentry Ins. v. Marks, 398 So.2d 24 (La.App. 4th Cir.1981).
Appellant argues that plaintiff is bound by her attorney's correspondence to Travelers Ins. Co., her uninsured motorist carrier for the second accident as an admission against interest. They contend that his correspondence admits that the second accident caused her ruptured discs. The only letter of significance is dated October 30, 1980, which states:
"As you can see from the medical reports of Drs. Richardson and Jarrott, although Karen was involved in two automobile collisions, one on January 17, 1980 and the second on March 19, 1980, the more serious one and the one which caused her ruptured intervertebral disc, was the March 19, 1980 accident. Accordingly, we feel that a settlement demand of $45,000.00 upon Travelers is realistic, based upon the special damages, the degree of severity of the injuries sustained and the fact that liability is clear."
"Please review these medical reports and we would most appreciate your contacting us immediately upon having done so, in order that we may hopefully conclude amicable disposition."
Extra-judicial admissions made by a party's attorney are clearly admissible as an exception to the hearsay rule. The trial *539 court concluded that those extra-judicial statements of an attorney pursuing the advocacy of his client were not binding in this litigation. We agree for the following reasons cited by the trial Judge:
"The issue is whether or not the extra-judicial conclusions of counsel to a third party are binding on his client.
All lawyers are partisans. With great emotions, they choose sides, and when the choice is made, arguments, phrases and conclusions are marshalled to serve their purposes. The advocate is the client's representative. He gives to his client the benefit of his learning, his talents and judgment, but it is for the Court to decide the facts.
His function is to argue and ethically present the evidence. He is an officer of the Court, assisting in the administration of justice, and acting under the theory that the truth is best discovered by forceful statements on both sides of the question.
Lawyers toil in the adversary system. Each side presents their evidence to the opposing party which is examined, distilled and evaluated. After evaluation, each side determines the merits of their respective positions and then has the option for many valid reasons to settle or have their defenses determined by a court.
When Travelers agreed to terminate the litigation by settlement, for whatever reasons, all of which are irrelevant, that settlement did not adjudicate the factual issues before the court: The Court is the exclusive finder of fact.
Therefore, the statements of plaintiff's counsel are merely the representations and conclusions of her attorney, made extrajudicially and are without weight. They are not binding upon the court as determinative of the issue, nor can they be used against his client as an admission against interest."
Civil Code Article 1934(3) provides that in assessing general damages, "much discretion must be left to the trial judge or jury." Before this Court will disturb an award made by a trial court the record must clearly reveal that the trier of fact abused its discretion in making its award.
"Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court." Reck v. Stevens, 373 So.2d 498 (La. 1979) at p. 505.
In the case at bar, plaintiff, Karen Villavaso, is a 29 year old female, formerly employed by Corey Coffee Company as a customer representative/salesperson, earning more than $300.00 per week. Her daily duties included extensive driving and lifting approximately twenty pounds. She was discharged from her employment because of her inability to perform those duties on July 12, 1980. She has undergone multiple hospitalizations, painful diagnostic tests and dangerous general surgery.
Presently, she has an undisputed permanent thirty percent anatomical disability and a permanent fifty percent functional disability, which will substantially restrict her social, recreational and domestic activities as well as interfering with her ability to drive, lift or climb. She has recurring headaches, severe neck pain and other ailments related to the accident, for which she regularly takes medicine. Further medical treatment is reasonably certain to occur.
Given these facts and the record as a whole we cannot say the trial court abused its great discretion in awarding plaintiff $250,000.00.
For the above and foregoing reasons the judgment of the trial court is affirmed. Costs of this appeal to be borne by Appellant.
AFFIRMED.
SCHOTT, J., concurs.
*540 SCHOTT, Judge, concurring:
In McCreary v. Commercial U. Ins. Co., 372 So.2d 745 (La.App. 4th Cir.1979) we were confronted with the same issue of causation from the first of two accidents (including a settlement with the second tort feasor for the aggravation he caused) and concluded that the trial court's finding of causation was not manifestly erroneous and was supported by the record. In the instant case I reach the same conclusion although the evidence is even less convincing than it was in the cited case.
We know that Dr. Jarrott, who first saw plaintiff in June, 1980, ultimately performed a discectomy at C5-C6 in August and in January, 1981, found still another ruptured disc at C4-C-5. Plaintiff had two accidents, on January 17, 1980, and March 18, 1980, both of which caused injuries to her neck and either of which could have caused one or both cervical disc ruptures. The trial court's award was based on his conclusion that both ruptures which already led to one discectomy and will probably lead to a second, along with a fusion in order to protect the disc at C6-C7, with all the pain and disability accompanying this condition, were the proximate result of the first accident.
This conclusion is supported primarily by the opinions of Drs. Gomila and Jarrott that the ruptures resulted from the first accident. As to Dr. Gomila, he suspected a ruptured disc on his initial examination of plaintiff on January 22 and for that reason he referred her to the neurosurgeon, Dr. Richardson. Thereafter, Dr. Gomila had little to do with the patient and could not recall what transpired on her four subsequent visits (February 16, March 5, May 20, and May 31). In December, 1980, Dr. Gomila issued a report from which he was allowed to read over defendant's objection the following excerpt:
"A. At this time I feel that she undoubtedly suffered a cervical disc rupture as a consequence of the January accident. Therefore, Dr. Richardson and Dr. Jarrott both concur with my opinion that the initial damage to her neck was done in January, and the March accident only served to exacerbate all pre-existing symptoms, plus the possibility of further damage to her neck."
Dr. Jarrott was convinced that the January accident caused the cervical disc rupture based on Dr. Gomila's initial findings of brachial plexus tenderness and radiation of pain into the right arm. He testified that the initial disc rupture "responded to conservative measures until she was reinjured in March, at which time she sustained a cerebral concussion and an aggravation of symptoms."
The most important medical witness, in my judgment, was Dr. Richardson, the neurosurgeon who treated plaintiff on January 25, eight days after the first accident, March 10, eight days before the second accident, March 21, March 31 and April 25. Initially he thought plaintiff sustained a ruptured disc, but by March 10, she had responded so well that he changed his opinion and diagnosed her problem as a cervical sprain. On this date she exhibited no evidence of nerve root irritation or brachial plexus tenderness. He maintained his diagnosis of cervical sprain even after the accident after examining her on three occasions. He never testified in retrospect that the disc ruptures were caused by the first accident. He offered that only as an initial impression which he later changed. But neither did he testify that the second accident caused the ruptured discs. He would only say that she had a cervical sprain all along and that her problem was aggravated by the second accident.
Our task on appellate review is not completed simply by locating the opinions of Drs. Gomila and Jarrott in the record that the disc ruptures were caused by the first accident. We are charged with the onerous responsibility of determining that this finding by the trial court is not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
After a painstaking review of this record I have made that determination despite what I perceive to be a refusal on the part *541 of Dr. Richardson, who was in the best position to know, to furnish the trial court with an unqualified opinion on the question. My impression is that Dr. Richardson didn't know one way or another and, because subsequent events proved that plaintiff had the ruptured discs which he didn't diagnose even after the second accident, he felt constrained to avoid expressing an opinion. However, he did supply one very important piece for this puzzle when he gave the following testimony on redirect examination by plaintiff's attorney:
"Q. Isn't itand I may have asked you this questionbut it's not uncommon, is it, for disc injury, including rupture, to go into periods of remission when the patient takes care of him or herself and is managed conservatively and rests and does the thing the doctor recommends?
* * * * * *
THE WITNESS:
No, it's the rule rather than the exception that people improve with disc ruptures. Most of the patients that we operate on for cervical disc rupture had intermittent symptoms for long periods of time. They may go for several months without any symptoms and have an episode of symptoms that will last for several weeks or months and they finally become more persistent until they finally decide they want something done, but cervical disc ruptures are rarely acute and immediate. That's unusual, in my experience."
When this testimony is considered together with the totality of the testimony of Drs. Gomila and Jarrott I feel compelled to determine that the trial court's finding of causation for the ruptured discs by the first accident is not clearly wrong.