# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

**09-1083**

**ALISA SIMON**

**VERSUS**

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, ET AL**

**\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2003-4288
HONORABLE ROBERT L. WYATT, PRESIDING
**\*\*\*\*\*\*\*\*\*\***

**SYLVIA R. COOKS**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Jimmie C. Peters, and Billy H. Ezell, Judges.

**REVERSED AND RENDERED**

Raleigh Newman
Donald McKnight
1830 Hodges Street
Lake Charles, LA 70601
(337) 439-5788
      COUNSEL FOR PLAINTIFF/APPELLANT:
      Alisa Simon

Allen J. Mitchell, II
Mitchell & Blanco, LLC
One Lakeshore Drive, Suite 1495
Lake Charles, LA 70629
(337) 436-8686
      COUNSEL FOR DEFENDANTS/APPELLEES:
      State Farm Mutual Automobile Ins. Co.

**COOKS, Judge**.

**FACTS**

Alisa Simon (Plaintiff) was injured in an automobile accident on August 12, 2002. She was a guest passenger in a 1999 Mazda. A GMC Sierra pick-up truck, owned by Nondestructive & Visual Inspection, Inc.(Nondestructive) and driven by Travis Poche (Poche), failed to stop for a red traffic light at the intersection of U.S. Hwy. 90 and La. Hwy. 397 in Calcasieu Parish. Poche's vehicle was traveling at about fifty miles per hour. He did not brake or slow down, and hit the car in which Plaintiff was a passenger, broadside. The vehicle had to be cut in two before Plaintiff could be removed from the vehicle. Nondestructive's vehicle was insured by State Farm Insurance Company (State Farm). The defendants admitted liability prior to trial, thus the only issues before the jury were causation and damages.

Plaintiff was taken by ambulance to a local hospital. According to the Acadian Ambulance Report, Plaintiff lost consciousness at the scene, and suffered a visible edema (swelling) at the base of her head as well as at four or five other areas. Plaintiff complained of pain in her back, shoulder, arm and head. Upon arrival at the first hospital, the ambulance paramedics were re-directed by the emergency room nurse to another hospital, Lake Charles Memorial Hospital (Memorial), because there was no neurologist on call at the first hospital. The second hospital's emergency room notes do not mention any head injury nor swelling on Plaintiff's head. X-rays were taken of Plaintiff's back but no CT scans nor x-rays were taken of Plaintiff's head. Plaintiff's mother testified the emergency room personnel did not exhibit concern for the seriousness of Plaintiff's injuries and seemed pre-occupied with attending the other victims of the same accident. Plaintiff was released from the hospital the night of the accident and allowed to return home.

According to Plaintiff and her mother, when Plaintiff awoke the following morning at her mother's home, they both observed blueish-black blood on Plaintiff's pillow about the size of a compact disc as well as dried blood in Plaintiff's ear and down the side of her face, which appeared to have come from her inner ear. Plaintiff's medical experts, including her treating physician, testified this was a strong indicator of traumatic brain injury, indicative of a basal skull fracture. Several days later, experiencing pain, Plaintiff returned to the emergency room at Memorial, where x-rays of Plaintiff's shoulder were taken. However, the attending physicians failed to diagnose Plaintiff's fractured collar bone, an injury diagnosed a few weeks later by Plaintiff's treating physician, Dr. Clark Gunderson (Dr. Gunderson).

Plaintiff was treated for four months and then released from her doctor's care. Plaintiff's treating physician could not recall if Plaintiff related the blood on the pillow occurrence to him but his medical records do not reflect any report of this occurrence until more than two years after the accident. Two years following the accident, Plaintiff's doctors diagnosed that she sustained a basal skull fracture. These findings were based on the objective clinical observations recorded by the ambulance paramedics, the physical observations of Plaintiff and her mother on the morning following the accident, and the objective medical tests administered by Plaintiff's medical and psychiatric experts. All of Plaintiff's experts agreed that the objective medical evidence was consistent with the information provided by Plaintiff and her mother and establishes that it is more probable than not, she suffered a basal skull fracture in the accident, which has resulted in permanent physical and neuropsychological injury. Plaintiff did not suffer from any physical ailment prior to the accident, and was gainfully employed as a certified nurse assistant for two years prior to the accident.

Subsequent to the accident, Plaintiff suffered from major depression and, at times, has experienced suicidal thoughts requiring her hospitalization on one occasion. According to her psychiatric experts, the traumatic brain injury she suffered in this accident, as well as the chronic pain resulting from other accident-related physical injuries have played major roles in directly causing or exaggerating this mental condition. After the accident, Plaintiff became pregnant and delivered a child, an event which she now describes as her only reason for living.

Defendants did not call any medical expert to directly contradict the clinical observations, diagnostic test results, medical records, and opinion of Plaintiff's treating physicians, choosing instead to rely solely on the testimony of a neuro-psychologist who testified Plaintiff is malingering. In addition, counsel for defendants throughout trial argued, over multiple objections by Plaintiff's counsel, that Plaintiff had a legal duty to mitigate her damages by securing medical care and she failed to do so. Defense counsel repeatedly reminded the jury Plaintiff's attorney, Mr. Raleigh Newman (Newman), paid Plaintiff's medical bills and guaranteed payment to all of her healthcare providers. In his opening statement defense counsel stated (emphasis added):

> Mr. Newman was involved in this case early on. And Mr. Newman arranged for that, and as is common in personal injury cases his office arranges for payment. *That's what happens in these cases. So it's not a situation where, I can't afford it, the lawyer's office takes care of that.*

He again stated later in his opening statement to the jury:

> Mr. Newman is talking about she can't afford it, well, all these expenses are going through the lawyer's office.

During cross-examination of Dr. Charles Robertson (Dr. Robertson) , one of Plaintiff's treating physicians, defense counsel asked if Newman was the party responsible for payment of Plaintiff's medicals, to which Dr. Robertson responded

affirmatively.

On cross-examination of Dr. Gunderson, defense counsel asked whether Mr.
Newman sent Plaintiff to him and then remarked:

> (Mr. Mitchell) And I mean, it's a common practice and not necessarily just with your office. It's a common practice that personal injury attorneys make arrangements with the doctors and the treating physicians to either pay in advance or guarantee payment from a case, is that correct?
>
> A. (Dr. Gunderson) Yes.

While questioning Plaintiff's mother, defense counsel asked:

> [A]ll of the medical expenses since this particular accident that have been incurred by Alisa– and I think Mr. Newman gave me a sheet today that says it[']s about $30,000.00– as far as you know Mr. Newman has made arrangements either to pay that or has paid that.
>
> A. Yes.
>
> Q. Have you ever requested that Mr. Newman pay for any medical expenses and he told you no?
>
> A. No.

Likewise, on cross-examination of Plaintiff, defense counsel asked:

> Since this particular accident– you know, Mr. Newman and Mr. Newman's office has been taking care of all of your medical bills.
>
> A. I guess so.
>
> Q. I mean, you haven't personally been paying any of them, have you?
>
> A. No sir.

Continuing this line of questioning, he asked Plaintiff:

> There's been testimony–again, we know Mr. Newman has been responsible for or has been paying or making arrangements for your medical bills

In closing argument, defense counsel, for the eighth time, mentioned Plaintiff had not secured funds from her lawyer for medicals:

> Mr. Newman testified extensively, he questioned witnessed (sic), and

argued extensively concerning Ms. Simon's inability to afford treatment, therefore she didn't get the treatment. She couldn't afford it. Her income was too low. Yet that $29,000.00 figure that he showed you, all of that was paid for by Mr. Newman's office. And you heard the testimony of Ms. Simon and her mother that he never rejected anything they asked him. Whenever they came in and she said, hey, something's going on need to figure it out let's–he set it up with Dr. Foster. Every bill that came in he paid for. **Now, the Judge is gonna instruct you that an attorney has no obligation or duty to pay for medical expenses. He does not. But we all know that in personal injury actions that's how it works. They pay for the medical bills. Whenever a case settles or whenever there's an award they get their money back**. They guarantee the payment to the various physicians. **Everybody knows that. And that's what was done in this particular case. He never turned her down.** So during any of this these are the physical complaints, the blue. Nowhere in 2003, nowhere in 2004 is there one visit with anybody associated with physical complaints as a result of this accident. Not even– not even walking into a walk-in clinic a "Doc-N-the-box," they charge you fifty bucks. Not an emergency room visit. And what about Moss Regional, Moss Regional is the hospital where people go that don't have insurance. And there doesn't have to be a neurosurgeon on staff. If you go in and say my back hurts there's a qualified doctor there that will do something. If you go in there and say I have a headache, if you go in there and say my neck hurts they gonna give you treatment. **So there were options available. So I'm just not certain that the "I can't afford it" is a good enough excuse.** (Emphasis added.)

Defense counsel then informed the jurors that the judge would instruct them on a plaintiff's duty to mitigate her loss and would instruct them that if she unreasonably refused to submit to treatment then she failed to mitigate her loss.

Defense counsel, shortly thereafter, made additional remarks:

Why not go have a brain MRI? A brain MRI costs about $2,700.00. That's what one brain MRI costs. It's a whole lot less than $10,000.00 for some neuropsychological testing. It's a whole lot less than saying, you know, Doc, here's $7,500.00, just hold on to it, do whatever you gotta do.

And I'm happy to hear that Dr. Robertson sent $4,100.00 back to Mr. Newman. That $4,100.00 could have paid for a lot of emergency room visits, a lot of walk-in clinic visits, a lot of physical therapy.

Defense counsel further stated (emphasis added):

Every person that she saw recommended that she see someone for her chronic pain complaints. Dr. Foster did. Dr. Robertson did. Dr.

Strother did. You say you're having pain, please go see a doctor, you're having pain go see a doctor. She never saw anybody.

*It would have been reasonable just to–you can't afford it, even though we know Mr. Newman was paying for it*, then go to Moss Regional. It's chronic pain. *Use ordinary care.*

Defense counsel then suggested the jury award Plaintiff $2,700.00 in future medicals so that she could have an MRI of her brain and put her mind to rest.

Mr. Newman objected to defense counsel's repeated statements and questioning to no avail. The judge finally agreed to instruct the jury as follows:

While attorneys at times pay the medical expenses of personal injury clients, the attorney is under no legal obligation or duty to pay those expenses.

The jury awarded the following damages:

Past Medical $4,400.00
Future Medical Expenses and Attendant Expenses $20,000.00
Loss of Future Earning Capacity $3,500.00
Past, Present and Future Mental and Physical Pain and Suffering $60,000.00
Disability "Zero"
Loss of Enjoyment and Quality of Life $25,000.00

Plaintiff appealed, alleging six assignments of error:

1.  The jury's award of $4,400.00 in damages for past medical expenses constitutes an abuse of discretion and should be increased;

2.  The trial judge committed manifest error by allowing defense counsel to argue that the plaintiff's attorney had a duty to pay the medical expenses of plaintiff;

3.  The trial judge committed manifest error by allowing defense counsel to argue that the jury should disregard the jury charges;

4.  The trial judge committed manifest error by precluding plaintiff counsel from arguing that in a clear liability case the insurer could offer to pay for the medical treatment recommended by plaintiff's doctors to treat her injuries;

5.  The jury's award of $3,500.00 for loss of future earning capacity constitutes an abuse of discretion and should be increased;

6.  The jury's award of $4,000.00 for pass (sic) loss of past wages constitutes an abuse of discretion and should be increased.

The defendants timely filed an answer to the appeal requesting this court take the following actions:

1.  Modify the judgment to decrease the amount awarded for future medical expenses from $20,000 to $0.

2.  Modify the judgment to decrease the amount awarded for past, present, and future mental and physical pain and suffering from $60,000.00 to $30,000.00.

3.  Modify the judgment to decrease the amount awarded for loss of enjoyment of life from $25,000.00 to $5,000.00.

In their brief to this court, the defendants have withdrawn their request to modify the jury award of past, present and future mental and physical pain and suffering and the jury award for loss of enjoyment of life. The defendants now assign only one issue for review: that the jury abused its discretion in awarding future medical expenses.

Plaintiff filed a "Motion To Suspend Briefing and Request To Remand To The Trial Court For An Evidentiary Hearing," [1] which motion was referred to the merits. Because we find there was legal error committed at the trial court level and are required to conduct a *de novo* review of the record, Plaintiff's motion and request for remand is denied.

## LAW AND DISCUSSION

Plaintiff urges it was legal error to allow defense counsel to argue and inform the jury that although the law does not require Plaintiff's counsel to pay for her medical care, in reality, "that's how it works." In doing so, defense counsel was permitted, over objection, to coax the jury into ignoring the judge's instruction that

---

[1] Plaintiff's attorney asserts in this motion he is entitled to a hearing on the record in the trial court concerning counsels' discussions off the record, during trial, with the trial judge, in bench conferences, regarding his objections to defense counsel's repeated references to Plaintiff's lawyer paying her medical bills.

a lawyer does not have a duty to pay medical expenses and to assign undue fault to the Plaintiff for not seeking medical care beyond her ability to afford.

Although attorneys are given much leeway in opening and closing statements, and in questioning witnesses, we find defense counsel's repeated attempts throughout trial to limit Plaintiff's damage claim by encouraging the jury to ignore one of the court's instructions and to rely on "what everybody knows happens in personal injury cases," i.e. the lawyer foots the bill, was improper and the trial judge's failure to sustain Plaintiff's counsel's multiple objections constituted legal error.

The Louisiana State Supreme Court has examined improper arguments made during trial and provided our courts with instructions in assessing when such comments constitute reversible error. In *State v. Harris*, 01-2730, p. 26 (La. 2005) 892 So.2d 1238, 1257, the prosecutor made improper remarks during closing argument in a criminal trial. The supreme court held that before a reviewing court can hold an improper argument constitutes reversible error, the court "must be thoroughly convinced the remark influenced the jury and contributed to its verdict, *State v. Eaton,* 524 So.2d 1194 (La.1988), *cert denied*, 488 U.S. 1019, 109 S.Ct. 818." We are convinced in this case that defense counsel's improper remarks made during his opening statement, closing statement, and throughout the trial, seriously influenced the jury, improperly affected its verdict, and undermined the judicial process.

Defendants offered no evidence to establish Plaintiff was financially able to secure medical care but failed to do so. Instead, he argued and reiterated that Plaintiff's attorney Newman could pay for whatever medical care Plaintiff needed. Neither did the defendants offer any evidence that free treatment was, in fact, available to Plaintiff and she willfully failed to seek such assistance.

Plaintiffs are not legally required to seek advances from their attorneys for medical treatment or diagnostic testing, and attorneys are not legally bound to pay for such costs. The defense tactic in this case severely interdicted the jury's fact finding mission, which we are convinced is evidenced by the awards it rendered. While the jury awarded $20,000.00 for future medical expenses, $60,000.00 for past, present and future pain and suffering, and $25,000.00 for loss of enjoyment of life, the jury awarded zero for disability and only $3,500.00 for loss of earning capacity. We cannot find, based upon the medical evidence and other testing in the record, that the jury did not improperly apply the wrong mitigation standard in assessing Plaintiff's loss. We must therefore conduct a *de novo* review of this case.

We have held:

> A trial court's findings of fact will not be disturbed unless they are manifestly erroneous or clearly wrong. *Fuselier v. State, through Dep't of Trans. & Dev.*, 05- 681 (La.App. 3 Cir. 1/11/06), 919 So.2d 867, *writ denied*, 06-334 (La. 4/28/06), 927 So.2d 289. "This standard, however, is not applicable when one or more legal errors by the trial court interdicts the fact-finding process, and, when permitted by the record, the appellate court should conduct a de novo review to determine the preponderance of the evidence." *Trahan v. Deville*, 05-1482, p. 2 (La.App. 3 Cir. 5/10/06), 933 So.2d 187, 190, *writ denied*, 06-2103 (La. 11/17/06), 942 So.2d 534 (citation omitted). "Legal errors occur when trial courts prejudicially apply incorrect principles of law." *Id.* "These errors are prejudicial when they materially affect the outcome of the matter." *Id.* "In these cases, appellate courts are bound, if possible, to apply the correct principles of law, determine material facts, and render judgments on the record." *Id.*

*Armentor v. Safeway Ins. Co.*, 07-805, p. 3 (La.App. 3 Cir. 12/19/07), 972 So.2d 444, 446 quoting *Lanningham v. Walton*, 06-1103, pp. 2-3 (La.App. 3 Cir. 2/7/07), 950 So.2d 922,924.

Any person injured through the fault of another is entitled to full indemnification for his damages. *See* La.Civ.Code art. 2315 and *Wainwright v. Fontenot*, 00-492 (La. 10/17/00), 774 So.2d 70. Additionally, it is well settled that

defendants take their victims as they find them and are responsible for all natural and probable consequences of their tortious conduct. *Am. Motorist Ins. Co. v. Am. Rent-All, Inc*., 579 So.2d 429 (La.1991).

> We have also held, regarding a plaintiff's duty to mitigate damages:

> Injured parties have a duty to mitigate their damages; however, they are only required to act reasonably in minimizing the consequences of their injury. *Al's Trucking, Inc. v. State Farm Fire & Cas. Co.*, 98-1542 (La.App. 3 Cir. 5/12/99), 735 So.2d 833, *writ denied*, 99-1681 (La.9/24/99); 747 So.2d 1122.

*Lacombe v. Buras*, 00-1145, p. 4 (La.App. 3 Cir. 1/31/01), 778 So.2d 1181, 1185.

*See also Aisole v. Dean*, 574 So.2d 1248 (La.1991).

> [T]he burden rests on the tortfeasor to show that the injured plaintiff failed to mitigate damages. The defendant must show (1) that the plaintiff's conduct after the injury was unreasonable and (2) that the unreasonable conduct had the consequence of aggravating the harm. *Hunt v. Long*, 33,395 (La.App. 2 Cir. 6/21/00), 763 So.2d 811.

*Etheredge v. St. Paul Mercury Ins. Co.,* 35,832, pp. 4-5 (La.App. 2 Cir. 4/3/02), 814 So.2d 119, 122. *See also Hale v. Aetna Life and Casualty Ins. Co.*, 89-1288 (La.App. 3 Cir. 5/22/91), 580 So.2d 1053.

Defendants failed to meet this burden. As mentioned, the defense failed to present any evidence which contradicted Plaintiff's evidence that she simply could not afford to avail herself of the treatments or diagnostic tests her experts recommended nor could she afford the medications she needs to help her function day-to-day. Neither did defendants call any medical witness to attempt to establish medically that Plaintiff's failure to get treatment or take medications recommended by her treating physicians and other doctors had the consequence of aggravating her injuries. Dr. Gunderson testified, in his opinion, physical therapy would not have helped Plaintiff prevent the problems she is having nor would it have changed Dr. William Foster, Jr.'s diagnosis that she sustained a head injury.

Defendant's only evidence was the testimony of its lone expert, Dr. Darren Strother (Dr. Strother), a neuro-psychologist, who opined that Plaintiff is malingering.[2] All of Plaintiff's experts testified she is not malingering. They based their opinions on objective observations and testing. Most persuasive in this regard is the testimony of Dr. James Anderson, M.D., a board certified psychiatrist in both forensic and general psychiatry. He explained that the hallmark of malingering is "inconsistency." According to his evaluations of Plaintiff, she was consistent in the reports she gave to him of her condition throughout the evaluations, and consistent in her response to treatment. He found this especially convincing where, as here, the patient has been consistent in her reports over a period of many years.

Dr. Lawrence Dilks, a clinical neuro-psychologist, testified his objective test results showed Plaintiff is not malingering. Again, he too testified the hallmark in making this determination is "consistency" and he found Plaintiff was consistent in all five presentations with him. He assessed Plaintiff first over a period of two days, and then, a year later, over a period of three days. According to his findings, all five of Plaintiff's presentations concerning her injuries were the same with only a mild degree of variation, which was expected from day to day. In sum, he stated "If she's lying she's one of the greatest actors of the twenty-first century–she'd have to have held up this false presentation since 2002 without any slips." He further stated "I don't want to be disrespectful to her but to be honest, she's just not that smart." The doctor also pointed out that, along with Dr. Robertson and Dr. Gunderson, he objectively observed she was in chronic pain.

Dr. Robertson, a clinical psychologist and neuro-psychologist, testified Plaintiff reported a number of symptoms "consistent" with someone who has suffered

---

[2] The record shows Dr. Strother spent an hour and forty minutes interviewing Plaintiff.

a traumatic brain injury. Her symptoms include memory complaints, problems on the job as a result of memory problems, bizarre behavior, distorted sensory perceptive events, vision impairment, hearing impairment, and physical injuries. In Dr. Robertson's expert opinion, it is more probable than not that she sustained a mild, traumatic brain injury in this accident. Dr. Foster referred Plaintiff to him because he suspected she suffered a brain trauma in this auto accident. He believed the strongest indicator in Dr. Foster's letter to him of traumatic brain injury was the report of bleeding from the ear the day after the accident. This episode suggests the possibility of a condition, referred to as hemotemporium or tympanum, commonly found after fractures and contusions to the brain. His examination and testing of Plaintiff produced objective indications consistent with such an injury.

He also testified her depression and chronic pain initially interfered with the validity of his first battery of tests. However, subsequent testing demonstrated she was not malingering. He relates her chronic back pain to the injuries she sustained in the motor vehicle accident. He explained that, although she probably suffered from undiagnosed depression before the accident, depression increases pain and pain increases depression, in a vicious cycle. According to Dr. Robertson, if a person has three or more bouts of depression, as Plaintiff has, there is a 90% chance that person will have periodic life-long bouts of depression. He testified she will need medication for depression for the rest of her life; and, if her chronic pain is not managed and she remains in a state of constant pain, she is at greater risk for depression relapses. He testified he was aware of the fact that Plaintiff stopped taking the Paxil he prescribed because she could not afford it and her parents were financially unable to help her. According to his expert opinion, Plaintiff, as of the date of trial, was not at a point to begin vocational rehabilitation because her test

scores show she is not able to succeed in a book training environment. He described her prognosis as "guarded" and described her options for work as "very limited or none."

Dr. Gunderson, a thirty-year veteran orthopedic surgeon, first saw Plaintiff on September 13, 2002. He testified Acadian Ambulance records show Plaintiff had an edema or swelling at the base of the skull caused by blunt trauma. Dr. Gunderson also discovered a fractured clavicle Plaintiff suffered in the accident, which the hospital emergency room doctors missed. He testified he was well acquainted with Dr. Foster as they performed many spine surgeries together for many years. He could not disagree with Dr. Foster's diagnosis of a basal skull fracture. He explained that with a skull fracture there is bleeding, and the blood can come out through the ear canal because the ear canal connects with the floor of the brain cavity.

In his examinations of Plaintiff, Dr. Gunderson further noted she experienced pain at 30 degrees straight leg lift which means she experiences pain when her leg is lifted only a few inches off the exam table. He testified physical therapy would not have helped Plaintiff prevent the problems she is having nor would it have impacted Dr. Foster's diagnosis of a basal skull fracture.

The evidence shows, without contradiction, Plaintiff had no known cognitive deficits before this accident. While Plaintiff may have been suffering from an undiagnosed depressive disorder prior to the accident, the evidence shows it was worse after the accident. As Dr. Anderson testified, the accident "was an exacerbation" of her symptoms. Indeed, for the first time in Plaintiff's life, she became suicidal and suffered recurrent bouts of suicidal tendencies and major depression after the accident. In response to whether he thought Plaintiff was an "eggshell plaintiff," Dr. Anderson testified:

In my opinion she had a history of depression, which predisposed her then to depression. She had obsessive compulsory disorder, which in my opinion had never been diagnosed or treated before. So she had psychiatric diagnoses and a family history. She was at risk I would say.

The evidence established Plaintiff was a very different person before the accident than following. She was able to hold a good job since she was sixteen years old and functioned well in society with a pleasant, outgoing personality. She liked to associate with people and had many friends. After the accident, her mother observed Plaintiff would daze off. She did not smile or laugh anymore and was not conversant as she was before the accident. She could not remember things without her mother writing them down for her. She stopped seeing her friends and just stayed at home watching TV and taking care of her son. According to Plaintiff and her mother, she cries a lot, is depressed, suffers bad headaches, is in constant physical pain, and expresses that her only reason for living is her son. Plaintiff's mother further testified she checks up on her daughter a lot because she is afraid she may harm herself. All of these observations are entirely consistent with the expert psychiatric and neuro-psychological evidence presented by Plaintiff's witnesses.

It is true:

In a personal injury suit, plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident which caused the injury. *American Motorist Insurance Co. v. American Rent-All, Inc.*, 759 So.2d 429 (La. 1991); *Aucoin v. State Farm Mut. Auto Ins. Co.*, 505 So.2d 993 (La.App. 3d Cir. 1987); *Richard v. Walgreen's Louisiana Co.*, 476 So.2d 1150 (La.App., 3d Cir. 1985). Plaintiff must prove causation by a preponderance of the evidence. *Morris v. Orleans Parish School Bd.*, 553 So.2d 427 (La. 1989). The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. *Mart v. Hill*, 505 So.2d 1120 (La. 1987); *Villavaso v. State Farm Mut. Auto. Ins. Co.*, 424 So.2d 536 (La.App. 4th Cir. 1982).

*Maranto v. Goodyear Tire & Rubber Co.*, 94-2603, 94-2615, p.3 (La. 2/20/95), 650 So.2d 757,759. Plaintiff has met her burden of proof and has shown it is more

probable than not that her injuries were caused by this accident. Defendants offered no credible medical evidence sufficient to refute this conclusion.

### *Past and Future Medical Costs*

Plaintiff's treating physicians and other medical experts all agree she was in need of the medical care, including the treatment and testing, she received and she will need future medical care. Dr. Gunderson testified she needs an MRI, which defendants agree will cost at least $2,700.00. Dr. Anderson testified, as a treating physician of Plaintiff, he has prescribed Paxil which she needs to take with other medication for the rest of her life. The medical records show Plaintiff's medications cost an average of $347.00 per month from December 2006 to August 2008. This computes to an annual cost of $4,164.00. Additionally, both Dr. Anderson and Dr. Robertson have diagnosed that Plaintiff is suffering from major depression and anxiety, and chronic pain disorder, with both physical and psychological features. They agree that Plaintiff has a very high probability of recurrent bouts of depression which will require psychotherapy and medication. Plaintiff's psychotherapy visits range from $125.00 to $178.00 per hour session. Dr. Anderson opined that "a number of the symptoms" he described indicate to him Plaintiff suffered a post-concussion syndrome as a result of injuries sustained in this accident. Dr. Foster, Dr. Gunderson, and Dr. Dilks all agree that, it is more probable than not, Plaintiff suffered a traumatic brain injury in this accident, identified as a moderate post-concussion syndrome, which has resulted in "significant" cognitive deficits. Dr. Foster diagnosed Plaintiff with 1) "cognitive impairment;" 2) "pain disorder with psychological and physiological features–moderate in severity;"3) "depression–organic depression caused by trauma secondary ro pain disorder and cognitive impairment;" and 4) "post traumatic stress disorder." The record evidence

establishes Plaintiff is entitled to recover her past medical expenses as they appear to be, more probably than not, related to the injuries she sustained in the accident. The evidence establishes that the Plaintiff's pretrial past medical expenses equaled $29,935.24.

In assessing Plaintiff's future medical claim, we note the Louisiana Supreme Court stated:

> When the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required. La. Code of Civ.Proc. Art. 2164.

*K Mart Corporation v. Stiles*, 597 So.2d 1012 (La. 1992). Further, we recently stated in *Cox v. Shelter Ins. Co.*, 09-958, p. 11 (La.App. 3 Cir. 4/7/10), ____ So.3d ____, 2010 WL 1328913:

> The plaintiff has the burden of proving, by a preponderance of the evidence, entitlement to special damages such as future medical expenses. *Thibodeaux v. Trotter*, 04-482 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31. In meeting her burden of proof on this issue, Mrs. Brown must show that more probably than not, these expenses will be incurred and she must present medical testimony that they are indicated and the probable cost of these expenses. *Veazey v. State Farm Mut. Auto Ins.*, 587 So.2d 5 (La.App. 3 Cir. 1991)

Plaintiff's expert, Dr. Charles Bettinger (Bettinger), applied a medical cost multiplier that calculates the future value of current medical costs on a per year basis if Plaintiff lives to age 81. He testified this is her life expectancy according to accepted national averages for women her age. Thus, as of the date of trial, Plaintiff has a life expectancy of 52.7 more years, which means she is expected to live past the age of 81 with a work-life expectancy to age 65. Bettinger calculated a medical cost multiplier of $46,343.00, expressed in $1,000.00 per-year-cost. Thus, if Plaintiff has

medical bills costing $2,000.00 per year, her projected lifetime costs will be $92,686.00, given her life expectancy. He further testified current medical costs have been experiencing double digit inflation. If such inflation continues, his multiplier figure would be much larger. Bettinger arrived at his figure assuming medical costs will increase by only 2% more than other goods and services. Based on the experts' uncontradicted medical evidence, it is clear that a reasonable amount which Plaintiff may incur in annual medical costs is at least $5,000.00 per year. According to Plaintiff's expert, this translates to a lifetime cost of $231,715.00. In addition, the record demonstrates Plaintiff needs an MRI of her brain at a cost of approximately $2,700.00. Therefore, the minimum award for future medicals is $234,415.00.

### General Damages

It is well settled that "[g]eneral damages include an award for the victim's pain and suffering, and as such, are intrinsically speculative and not subject to mathematical certainty." *McDaniel v. Carencro Lions Club*, 05-1013, p. 36 (La.App. 3 Cir. 7/12/06), 934 So.2d 945, 972, *citing Wainwright v. Fontenot*, 00-0492 (La.10/17/00), 774 So.2d 70. Because we find legal error in the trial court's award of damages, we are not bound by the highest/lowest constraints articulated in *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La. 1976) and *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La. 1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). *See Mart v. Hill*, 505 So.2d 1120 (La. 1987) and *Basco v. Liberty Mutal Ins. Co.,* 05-143 (La.App. 3 Cir. 8/17/05), 909 So.2d 660. We recently addressed the issue of general damages for a twenty-four year old plaintiff injured in an auto accident who suffers chronic pain and will face the choice of surgery or continued daily suffering the rest of her life. *See Cox v. Shelter Ins. Co.,* _____ So.3d _____, 2010 WL 1328913. In *Cox*, the twenty-four-year-old plaintiff, like Plaintiff,

had no pain prior to the accident of the sort from which she suffered after the accident. After her accident, Mrs. Brown, in *Cox,* suffered from ongoing, daily problems such as picking up her children, lifting any heavy weight, pain when sitting or standing for long periods of time, and severe headaches. Mrs. Brown was shown on video surveillance continuing her daily activities despite her pain. Nevertheless, we found the lowest award for Mrs. Brown's general damages was $250,000.00, a sum which included loss of enjoyment of life. In making that award we considered "the effects of the particular injury on Mrs. Brown, and in particular her youth and the consequent lengthy extent of her probable suffering." *Cox, supra.* at p.10. We cited numerous cases in *Cox* which support such an award. *Id.* Likewise, in the present case, Plaintiff was a young woman, twenty-three years of age, when this accident occurred. According to all of her medical experts, her mother, and Plaintiff, she too suffers from chronic pain and was diagnosed with major depression after the accident. According to her mother's testimony, and her own, uncontradicted by any evidence, she did not suffer any pain prior to the accident and was a happy and outgoing young woman. Her life has changed as a result of the injuries she sustained in this accident, and the expert witnesses have testified it is more probable than not that her chronic pain is a result of the injuries she sustained in this accident. They further testified her depressive disorder, at the very least, has been greatly exacerbated by this accident. She has suffered a permanent cognitive impairment, memory loss, and like Mrs. Brown, suffers from frequent headaches. Plaintiff's uncontroverted medical evidence demonstrates she suffered a traumatic brain injury in this accident. For the reasons stated above we believe Plaintiff is entitled to at least $250,000.00 in general damages. *See Cox, supra*. and the cases cited therein.

***Lost Wages***

Bettinger, qualified as an expert in economics and statistics, testified regarding Plaintiff's past lost wages and future loss of earning capacity. He calculated that her total past loss of earnings up to the date of trial was $59,855.00. This figure allowed for the money she earned during two brief periods of employment post-accident. He did not include any lost wages for the six months of her pregnancy. Bettinger based his calculations on the evidence of Plaintiff's actual work history prior to the accident. During the two years of work prior to the date of the accident, August 12, 2002, Plaintiff earned an average annual income of $23,500.00 plus fringe benefits. Based upon this figure, crediting Plaintiff for income earned after the date of the accident up to the date of trial, and deleting six months during Plaintiff's pregnancy, Bettinger calculated Plaintiff's total past loss of income. For the reasons discussed herein Plaintiff is entitled to this recovery and we therefore award her the sum of $59,855.00 in lost wages.

***Loss of Earning Capacity***

In order to calculate Plaintiff's loss of earning capacity, Bettinger converted Plaintiff's 2000-2001 average earnings to 2008 dollars, which results in an average annual income of $28,891.00 in 2008 dollars. He also testified Plaintiff's work life expectancy is to age 65. Thus, based on Plaintiff's demonstrated earning capacity in 2000-2001, Plaintiff's loss of earning capacity is $995,832.00 if Plaintiff is unable to work for the remainder of her work-life expectancy. If, however, Plaintiff is able to work half-time, at a minimum wage of $7.25 per hour, for the next 35 years, in present-value dollars she would earn $186,722.00, assuming there would be no costs involved in making it possible for her to return to work. Although Bettinger testified he believed there will be costs involved in training Plaintiff to return to work, he did not include such costs in his calculations. Without this additional cost Plaintiff's

earnings will equal $809,060.00 over the next thirty-five years even if she works half-time at minimum wage. Thus, Plaintiff's total past lost wages and future loss of earning capacity if she cannot ever return to work is $1,055,687.00. If Plaintiff is able to return to work on a half-time basis, earning only minimum wage, her total future earning capacity is $868,959.00. These figures mean, that, if Plaintiff invests the money she receives safely with a fair rate of return, assuming interest keeps up with inflation, Plaintiff will have spent the entire amount to keep her at the same buying level as if she had continued to work making $23,000.00 a year as she averaged prior to this accident. Bettinger further explained, if Plaintiff returns to work full time, but is only able to earn minimum wage due to the cognitive impairments her doctors say she has suffered as a result of this accident, which make it unlikely that she can engage in the type of work she did before the accident, her total anticipated future loss of earning capacity will be $614,500.00.

We explained loss of earning capacity in *Batiste v. New Hampshire Ins., Co*, 94-1467, p. 3-4 (La.App. 3 Cir. 5/3/95), 657 So.2d 168, 170, *writ denied*, 95-1413 (la. 9/22/95), 660 So.2d 472 (citations omitted):

> Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity.

> In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition.

> The very nature of lost earning capacity makes it impossible to

measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiff's condition prior to the accident, his work record prior to and after the accident, the amount of work life remaining, inflation, and the plaintiff's employment opportunities before and after the accident.

Despite disadvantages in her life, Plaintiff worked for two years prior to the accident as a healthcare professional, which she would likely have continued as a career. According to all of her expert witnesses, her mother's testimony, and her own testimony, she is not likely to be able to return to this type of employment. In fact, according to the expert testimony, Plaintiff will need training in order to be able to return to the workforce. Moreover, because of her cognitive impairment she will need apprentice training. Plaintiff has been able to perform limited work since the date of the accident. Plaintiff's witnesses believe she may only be able to qualify for minimum wage employment. According to her expert, if Plaintiff is able to work full time at minimum wage, given her pre-accident average annual earnings, she has suffered a loss of at least $614,500.00. This calculation is conservative because it does not account for any costs involved in making it possible for her to return to work, although her experts opine such costs will be necessary. Bettinger calculated this figure using Plaintiff's average annual income of $23,500.00 plus fringe benefits for the two years she worked prior to the accident, converting these 2001 dollars to 2008 dollars, the year in which the case was tried. In 2008 dollars, Plaintiff's average annual income, based on her prior history of employment, would be $28,891.00. He further testified she has a work-life expectancy to age 65, which as of the date of trial meant she has 35 more years to work.

It is clear that Plaintiff's recurrent bouts with depression and continued chronic pain as a result of the injuries she sustained in this accident will continue and will adversely affect her employment opportunities and perhaps, according to the expert,

her employability. Indeed it is "impossible to measure" this type of loss with any kind of mathematical certainty. Considering the evidence before us, Plaintiff's previous work history, and her brief work history after the accident, it appears likely that she will return to some type of gainful employment but functioning well below the level she was capable of performing prior to the accident. With managed medical care for her ongoing medical problem, it is likely she will be able to earn more than minimum wage at stages in her life, but less than the level of income she previously enjoyed. Based on the evidence as a whole, we believe a fair award for loss of future earning capacity in this case is $350,000.00.

For the reasons stated, we reverse the trial court judgment and render judgment in favor of Plaintiff, Alisa Simon, and against defendants in the amounts as follows, plus judicial interest from date of demand on all sums awarded, as well as all court costs plus costs of this appeal:

Past Medical Costs..............................................................$29,935.24

Future Medical Costs.........................................................$234,415.00

General Damages Including Past, Present, and Future
Pain and Suffering and Loss of Enjoyment of Life.............$250,000.00

Lost Wages.........................................................................$59,855.00

Loss of Earning Capacity....................................................$350,000.00

**REVERSED AND RENDERED.**