NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-316

PATRICIA P. ANTLEY AND RICKY ANTLEY

VERSUS

STATE OF LOUISIANA, THROUGH THE BOARD
OF SUPERVISORS FOR THE UNIVERSITY OF
LOUISIANA SYSTEM

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES NO. 76,880, DIVISION A
HONORABLE ERIC HARRINGTON, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

JIMMIE C. PETERS
JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Billy H. Ezell, and Shannon J. Gremillion, Judges.

AFFIRMED AS AMENDED.

T. Taylor Townsend
Keenan K. Kelly
Kelly & Townsend, L.L.C.
Post Office Box 756
Natchitoches, LA 71458-0756
(318) 352-2353
COUNSEL FOR PLAINTIFFS/APPELLEES:
 Patricia P. Antley and Ricky Antley

**James E. Calhoun**
**Assistant Attorney General**
**Post Office Box 1710**
**Alexandria, LA 71309-1710**
**(318) 487-5944**
**COUNSEL FOR DEFENDANT/APPELLANT:**
  **State of Louisiana, Through The Board of Supervisors**
  **For The University of Louisiana System**

PETERS, J.

The defendant, the State of Louisiana, through the Board of Supervisors for the University of Louisiana System (hereinafter referred to as "the state"), appeals a jury verdict finding it partially at fault in causing the injuries sustained by Patricia P. Antley when she fell from a stage located in the Student Union building on the Northwestern State University (NSU) campus in Natchitoches, Louisiana. Mrs. Antley and her husband, Ricky Antley have answered the appeal, seeking an increase in the quantum award and damages for frivolous appeal. For the following reasons, we amend the trial court judgment to increase the quantum award, affirm the trial court judgment as amended, and reject the request for damages for frivolous appeal.

## DISCUSSION OF THE RECORD

Mrs. Antley sustained her injuries on October 8, 2003, as she fell as she descended from the first tier of a three-tier stage located in the ballroom of the Student Union building on the NSU campus. She had just completed her course work for an associate degree at NSU, and was in the Student Union participating in "Grad Fest" to finalize the paperwork for graduating, as well as selecting graduation invitations, being fitted for a cap and gown, and purchasing other graduation-related items. "Grad Fest" is the single day of each semester set aside by NSU wherein it allows certain vendors to set up shop in the Student Union as a one-stop shopping facility to assist the seniors in preparing for graduation. As Mrs. Antley left the station of one of the vendors, Barnes and Noble Booksellers, Inc. (Barnes and Noble), she fell from the stage, sustaining serious personal injuries.

The Antleys[1] brought this suit against the state and Barnes and Noble asserting that the area where Mrs. Antley fell was unreasonably dangerous. Before trial, the Antleys dismissed Barnes and Noble from the litigation, and a jury trial resulted in a verdict assigning the state sixty-six percent of the fault in causing the accident.[2] The jury then concluded that Mrs. Antley suffered the following monetary damages:

| | |
|---|---|
| Past medical expenses | $ 54,765.70 |
| Future medical expenses | $ 18,000.00 |
| Past loss of earnings | $  7,607.48 |
| Past, present, and future physical pain and suffering | $ 65,000.00 |
| Past, present, and future mental anguish and distress | $  8,000.00 |
| Past, present, and future loss of enjoyment of life | $    -0- |
| Permanent disability | $ 18,000.00 |

Based on the Antleys' motion for an additure, the trial court awarded Mrs. Antley an additional $10,000.00 for past, present, and future loss of enjoyment of life.

The state timely perfected this appeal, asserting only that the evidence does not support a finding that an unreasonably dangerous condition existed. Mrs. Antley answered the appeal seeking an increase in the general damages award, as well as damages and attorney fees for frivolous appeal.

## OPINION

The Antleys appear to have asserted two theories of recovery in their pleadings: negligence and strict liability. However, with regard to an action against a public body, the theories present a distinction without a difference because the burden of

---

[1]Although Mr. Antley joined his wife as a party plaintiff in the initial suit and in the appeal, and although the original petition asserts a claim for damages suffered by the community of acquets and gains existing between he and his wife as well as a claim for loss of consortium, the judgment rendered makes no mention of these claims and awards all sums to Mrs. Antley.

[2]The jury assigned sixteen percent of the fault in causing the accident to Barnes and Noble Booksellers, Inc., and assigned the remaining eighteen percent to Mrs. Antley.

proof for both theories is the same. With regard to negligence, La.Civ.Code art. 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." This negligence cause of action extends to damages caused by persons or things within in our control and custody. La.Civ.Code art. 2317. Strict liability applies to damages sustained as a result of the ruin, vice, or defect of things within our control upon a showing that the owner/custodian "knew or in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care." La.Civ.Code art. 2317.1. However, La.R.S. 9:2800 extends the knowledge requirement of La.Civ.Code art. 2317.1 to negligence suits against public bodies. It provides in part:

A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.

B. Where other constructions are placed upon state property by someone other than the state, and the right to keep the improvements on the property has expired, the state shall not be responsible for any damages caused thereby unless the state affirmatively takes control of and utilizes the improvement for the state's benefit and use.

C. Except as provided for in Subsections A and B of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.

D. Constructive notice shall mean the existence of facts which infer actual knowledge.

Thus, in the matter now before us, the Antleys were required to establish by a preponderance of the evidence that the state 1) was in custody of the thing causing

3

her injuries; 2) that the thing was defective as a result of a condition which created an unreasonable risk of harm; 3) that the state had actual or constructive knowledge of the defect and failed to remedy it within a reasonable amount of time; and 4) that the defect was a cause-in-fact of her damages. *King v. State of Louisiana*, 08-683 (La.App. 3 Cir. 12/10/08), 998 So.2d 913. As these findings are all factual in nature, an appellate court reviews the trial court's judgment pursuant to the manifest error—clearly wrong standard of review. *Stobart v. State through DOTD*, 617 So.2d 880 (La.1993).

### The State's Appeal

With regard to the nature of the hazard, Carl Henry, a thirty-four year employee of NSU and a seventeen-year director of the Student Union, testified that he was responsible for setting up and supervising all of the Student Union's activities, including Grad Fest. He described the ballroom in the Student Union as a large rectangular shaped room, which was approximately seventy feet long by seventy feet wide. He explained that the ballroom's floor was flat throughout, except for its stage, which consisted of three tiers. Mr. Henry acknowledged that the stage presented a trip hazard and that he was aware of the hazard prior to October 8, 2003. He testified that it was his practice to walk through the ballroom with the event host in order to explain its layout and point out any problem areas, such as the three-tiered stage.

In regard to Grad Fest in October of 2003, Mr. Henry stated that he knew the stage would present a hazard particularly as Barnes and Nobles' table was located on the first tier. He testified that he believed this would present a problem because the students would be distracted while trying on caps and gowns. Although he could not remember to whom he specifically spoke, Mr. Henry testified that he thought he had

4

pointed this hazard out to the Barnes and Noble employees. Additionally, he testified that he would not have recommended using the first tier of the stage as it was used by Barnes and Noble. Although he was aware of the hazard, Mr. Henry admitted that he did nothing further to ensure the safety of the area, such as roping or barricading off the area or by putting up signs warning of the trip hazard.

Mrs. Antley testified that Barnes and Noble's booth was arranged in such a way that the tables were on the first tier, hanging racks were on the second, and boxes were on the third tier. She stated that the carpet on all three tiers was the same color and that it blended together whenever she looked down so that it was hard to notice the change in elevation. She stated that there was no boarder along the edge of the stage, nor was there any sign or marking warning her to "Watch your step."

The state did not provide this court with assignments of errors as required by Uniform Rules—Courts of Appeal, Rule 2-12.4. Instead, it couched its complaints on appeal in terms of two "QUESTIONS OF LAW PRESENTED" which reads as follows in the state's brief to this court:

1.    The State's employee, the manager of the NSU Ballroom, had the area set up for Barnes and Nobles, sellers of caps and gowns. He testified that he always went through the area with people using the facility pointing any hazard. He considered the use of the stage for trying on caps and gowns a trip hazard. No one contradicted his testimony. Can a judgment finding that the State employee placed patrons of Barnes and Noble in an unreasonably dangerous condition?

2.    Plaintiff slipped onto a stage and later slipped off falling and injuring herself. There was no testimony from anyone with knowledge or expertise about state design. Can a judgment finding the state defective be support [sic] where there is no evidence that it was improperly constructed or maintained?

A reading of these assertions makes it clear that the state does not contest the fact that its own Student Union director of seventeen years found the area where Mrs. Antley

5

sustained her accident to be a hazard, and that he recognized the presence of this hazard long before the accident of October 8, 2003. At best, the state seems to be arguing that any judgment finding the existence of an unreasonably dangerous condition must be supported by design expert testimony. We find no requirement in the law.

After reviewing the record in its entirety, we find no error in this finding and affirm the jury's finding as to the state's liability. Mr. Henry testified in unequivocal terms that the stage presented a trip hazard, that he knew it presented a hazard, and that he knew this prior to October 8, 2003. Accordingly, the trial court's judgment finding that the stage presents an unreasonable risk of harm is affirmed.

### Mrs. Antley's Answer to the Appeal

In her answer to the appeal, the Antleys seek an increase in quantum and damages for frivolous appeal. Although the answer itself requests that "the judgment appealed from be modified and revised to address the insufficiency of the amount of plaintiffs' recovery," in their brief to this court, the Antleys address only the adequacy of the $65,000.00 award for past, present, and future physical pain and suffering. While we must limit our review to that award, we do find it to be inadequate for the injuries sustained.

Mrs. Antley testified that when she fell, she hit the floor hard, hitting her face, shoulder, hands, and knees. Although she was stunned, she was able to get up and find someplace to sit. When she did sit down again, she realized that she had urinated on herself. Shortly thereafter, she began experiencing excruciating pain and began shaking. According to Mrs. Antley, she then went to Mr. Henry's office where she

6

remained for approximately three hours before being transported by ambulance to the hospital, where she remained another six hours.

Mrs. Antley sustained several fractures in the accident. Dr. Edward Anglin, a Shreveport, Louisiana orthopedic surgeon, testified that she suffered a fractured patella of the right knee, a partially torn medial collateral ligament, a fracture of the radial neck of the right elbow, and contusions to her left rib cage. Dr. Anglin testified that it took quite a bit of force to cause these injuries, and he opined that Mrs. Antley's fractures were very painful. According to Dr. Anglin, he would expect that separately, a patella fracture would heal in three months, and that a partially torn ligament would resolve itself in six to eight weeks. However, given the combination of injuries, he doubted that the patella would heal completely before the ligament, and that both would take approximately three to six months to heal. Dr. Anglin testified that Mrs. Antley's elbow would require two to three months to heal and her ribs would require approximately two months. He suggested that even after these fractures healed, Mrs. Antley would continue to experience pain for several weeks in varying amounts based on her activities and her response to physical therapy.

Dr. Stewart Bundrick, Jr., a Bossier City, Louisiana urologist, testified that Mrs. Antley developed an involuntary leakage of urine from her bladder as a result of this fall. He testified that urodynamic testing of the bladder revealed a weakness of the muscle surrounding the urethra which allowed the leakage. Dr. Bundrick stated that he performed outpatient surgery on Mrs. Antley to correct this problem, and during the procedure performed a pubovaginal sling, which involved small incisions in the vagina and the lower abdomen and the insertion of cadaveric tissue to strengthen the urethra and the bladder neck. Dr. Bundrick testified that although

7

the surgery was successful, Mrs. Antley developed a complication in the form of a hematoma in the vaginal wound. This complication required that she be admitted to the hospital for five days of wound care and treatment with antibiotics. Dr. Bundrick testified Mrs. Antley experienced a significant amount of pain, as well as fever, as a result of the hematoma. Although surgery corrected Mrs. Antley's incontinence, Dr. Bundrick stated that there is an increased risk that the sling will fail in approximately ten years, after which a repeat of the surgical procedure would be required to correct this problem.

Dr. Steven Wheat, a Natchitoches, Louisiana physiatrist, internist, and electrodiagnostic medicine physician, testified that after her accident he began treating Mrs. Antley for lower back and wrist complaints. He stated that December 19, 2003 x-rays revealed arthritis in both wrists and hands, as well as a bone cyst in the lunate bone of her left wrist. Dr. Wheat stated that he also performed an ultrasound of both of Mrs. Antley's legs to rule out the possibility of a blood clot as she exhibited swelling in her legs. He testified that an MRI was performed of her lumbar spine based on her complaints of radicular pain down into her legs; the MRI revealed bulging discs at L4-5 and L5-S1. Although Dr. Wheat stated that it was difficult to say whether Mrs. Antley's bulging disc were caused by her fall, he opined that the fall could easily have exacerbated a preexisting condition. Thus, he felt that her complaints were causally related to her accident. Finally, Dr. Wheat testified that Mrs. Antley will definitely experience future problems as a result of this fall, especially from the fractures. As these involved joints, he stated that Mrs. Antley will have problems with the development of arthritis at those locations.

8

According to Mrs. Antley, prior to the accident, she had led a very active lifestyle. She testified that she boarded and trained dogs, including police dogs, and she showed her own dogs in obedience classes. Mrs. Antley also stated that she liked riding and she taught riding lessons. Since her fall she is no longer able to do any of these things. Additionally, her injuries curtailed her travels with her husband in their camper because she is no longer able to travel for long distances in an automobile.

According to Mrs. Antley, her injuries caused her to be wheelchair bound for a long period of time and she required help from her family in order to use the restroom, obtain food, cloth herself, and bathe. She participated in physical therapy after the accident.

Mr. Antley's testimony supported his wife's description of her pain and disabilities as well as her medical history. Both testified that prior to her accident, Mrs. Antley enjoyed good health and enjoyed the numerous physical activities in which she can no longer participate. Additionally, Katherine Johnson, Mrs. Antley's co-worker at the Cane River National Heritage Area, supported her testimony and the medical evidence. She acknowledged Mrs. Antley's excellent health before the accident, her use of the wheelchair, and her initial inability to return to full-time work due to her injuries and the pain associated therewith. Additionally, Ms. Johnson noticed a change in Mrs. Antley's disposition in that she ceased to be her jovial self. Although Mrs. Antley had returned to full-time employment by the time of trial, Ms. Johnson testified that she was still aware of Mrs. Antley's bladder issues, her back pain, and the fact that she requires pain medication in large amounts to combat her pain. She testified that Mrs. Antley avoids lifting at work in order to protect her back from further injuries.

9

General damages are damages which are speculative in nature as they are incapable of being determined with any specificity. *Wainwright v. Fontenot*, 00-492 (La. 10/17/00), 774 So.2d 70. Included in this award is damages for pain and suffering. *Id.*

> In considering whether the award of general damages is excessive, we are guided by the decision in *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), wherein the supreme court noted that "the discretion vested in the trier of fact is 'great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Under *Youn*, "[t]he initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the 'much discretion' of the trier of fact." *Id.* at 1260. Only after the initial inquiry is answered in the affirmative should the appellate court increase or reduce the award. *Id.*
>
> . . . .
>
> The supreme court has held that when a jury's award for damages is excessively low, even when the jury awards no damages for a particular item, this court can only increase the award "to the lowest amount which is reasonably within the court's discretion." *Ryan v. Zurich Am. Ins. Co.*, 07-2312, p. 7 (La.7/1/08), 988 So.2d 214, 219.

*Cox v. Shelter Insurance Co.*, 09-958, pp. 17-18 (La. App. 3 Cir. 4/7/10), 34 So.3d 398, 409-10 (alteration in original).

Although Mrs. Antley's brief limits her argument to the $65,000.00 awarded for her past, present, and future pain and suffering, the jury awarded an additional $26,000.00 for past, present, and future mental anguish and permanent disability. An additional $10,000.00 was awarded to Mrs. Antley by the trial court on her motion for JNOV, for a total general damages award of $101,000.00. After reviewing the record, we conclude that the award for past, present, and future pain and suffering (the only award before us) is abusively low considering all that Mrs. Antley has suffered as a result of her accident. Accordingly, we will raise her general damage

10

award to the lowest amount that would have been reasonably within the trier of fact's discretion. Although we have found no cases involving a plaintiff who has suffered all of the injuries suffered by Mrs. Antley, we find that the lowest amount that the jury could reasonably have awarded Mrs. Antley for past, present, and future pain and suffering is $150,000.00 based on the effect her particular injuries had on her. *See generally Locke v. Young*, 42,703 (La.App. 2 Cir. 12/12/07), 973 So.2d 831; *Millet v. Evangeline Health Care, Inc.*, 02-1020 (La.App. 5 Cir. 1/28/03), 839 So.2d 357; *Carrier v. Nobel Ins. Co.*, 01-983 (La.App. 3 Cir. 2/6/02), 817 So.2d 126, *writs denied*, 02-728, 02-739 (La. 5/10/02), 815 So.2d 843, 845; *Banks v. New Orleans Sewerage and Water Bd.*, 98-1373 (La.App. 4 Cir. 1/27/99), 728 So.2d 527. The trial court's judgment is amended to increase Mrs. Antley's award for past, present, and future pain and suffering to $150,000.00.

Finally, the Antley's have answered the state's appeal raising a claim of frivolous appeal on the part of the state. Damages for such an appeal are allowed under two circumstances: (1) when taken solely for delay or (2) when the appellant is "not sincere in the view of the law he advocates even though the court is of the opinion that such view is not meritorious." *Parker v. Interstate Life & Accident Ins. Co.*, 248 La. 449, 179 So.2d 634, 636 (1965).

Although we find no merit in the state's argument, we find no absence of sincerity on the part of the state's counsel in lodging this appeal. Thus, we deny the request for damages based on frivolous appeal.

**DISPOSITION**

For the foregoing reasons, we amend the trial court's judgment to increase the award for past, present, and future pain and suffering from $65,000.00 to

11

$150,000.00. We affirm the trial court judgment in all other respects and deny the Antleys' request for damages for frivolous appeal. We tax all costs of this appeal to the State of Louisiana through the Board of Supervisors for the University of Louisiana System. Pursuant to La.R.S. 13:5112, we set the amount due from the State of Louisiana, through the Board of Supervisors for the University of Louisiana System, at $2,402.25.

**AFFIRMED AS AMENDED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules, Courts of Appeal.